**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramiro MAGANA, et al., Defendants–
Appellants.**

Nos. 95–2640, 95–2641, 95–2642,
95–2643, 95–2644, 95–2791,
95–2953 and 95–3336.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1996.

Decided July 18, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 27, 1997.

Barry Rand Elden, Chief of Appeals, Charles Ex (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Ronald J. Clark (argued), Chicago, IL, for Defendant–Appellant Ramiro Magana.

Kevin E. Milner (argued), Palatine, IL, for Defendants–Appellants Raul Aguilera and Wilson Iturralde.

Jo–Anne Wolfson, Tampa, FL, James J. Cutrone (argued), Chicago, IL, for Defendant–Appellant Santiago Rabon.

Brian M. Collins (argued), Constantine N. Bastounes, Collins & Bastounes, Chicago, IL, for Defendant–Appellant Robert Ameneiro.

James J. Cutrone (argued), Chicago, IL, for Defendant–Appellant Mukglis Toma.

Scott J. Frankel (argued), Frankel & Cohen, Chicago, IL, for Defendant–Appellant Ismael Rosa.

Jeffrey E. Stone (argued), Ira M. Kalina, McDermott, Will & Emery, Chicago, IL, for Defendant–Appellant Jose Pinto.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

This case presents the consolidated appeals of eight Defendants who were charged with conspiracy to distribute cocaine and marijuana and were convicted of a variety of federal narcotics offenses. Defendants on appeal raise challenges to their convictions and sentences. We affirm.

## I. Factual Background

The conspiracy to distribute cocaine and marijuana centered around Defendant–Appellant Mukglis Toma (Toma), who was a wholesaler of cocaine and marijuana in the Chicago area. Toma purchased quantities of cocaine and marijuana from suppliers, and resold it to street dealers, who in turn sold it to their clients. Toma's cocaine suppliers

included Defendants–Appellants Ramiro Magana (Magana), Santiago Rabon (Rabon), Jose Pinto (Pinto), Raul Aguilera (Aguilera), and Wilson Iturralde (Iturralde). Toma was also supplied cocaine by Ramon Valencia (Valencia), who worked with Magana but was not named in the superseding indictment, and Rodolfo Garcia (Garcia), who was indicted, but ultimately agreed to testify for the government in exchange for entering a plea of guilty to reduced charges. Garcia supplied Toma with marijuana as well.

A number of individuals assisted Toma or were supervised by him in the furtherance of the drug distribution scheme. All of these individuals-George Ishu (Ishu), Doris Ress (Ress), Ammanuel Youkhanna (Youkhanna), and Wesam Youmaran (Youmaran)—were named in either the original or superseding indictment, but they were not listed as Defendants in the instant case.

Toma resold the cocaine and marijuana to Defendants–Appellants Robert Ameneiro (Ameneiro) and Ismael Rosa (Rosa).[1] Toma also sold cocaine and marijuana to Miguel Rivera (Rivera), Janice King (King), Ishu, Youkhanna, and Herman "Yum" Matthews (Matthews). These latter five individuals were indicted, but were not named in the instant case. Finally, Toma sold cocaine to Stuart Glaser (Glaser), who, for reasons we will discuss, was not ultimately indicted in this case.

On July 21, 1993, after purchasing a quarter-kilogram of cocaine from Toma at Toma's mother's residence on the northwest side of Chicago, Glaser departed from the residence in his Jeep. Unbeknownst to Glaser, the residence was under surveillance by officers of the Chicago Police Department assigned to work on a special FBI narcotics task force. As Glaser left the house in his Jeep, the officers kept him under surveillance, until Glaser sped away down an alley, where the officers followed and observed Glaser throwing out his recent cocaine purchase. The officers in pursuit retrieved the cocaine, and apprehended Glaser later that day.

After his arrest, Glaser agreed to assist the government and began recording the phone calls he made to Toma. During these taped conversations Glaser stated that he would continue to purchase cocaine from Toma. At the suggestion of FBI agents, Glaser also supplied Toma with a cellular phone furnished by the FBI. Glaser represented to Toma that, because the phone was "digital," it was untraceable and Toma would not have to pay for the calls he made. In fact, all of Toma's phone calls from this phone were subject to a "pen register."[2] During this period, Glaser and Toma both spoke over the phone several times concerning cocaine transactions, and met in person on numerous occasions. Each time they met in person, Glaser was equipped with a recording device.

In addition to the taped conversations between Toma and Glaser, and conversations between Toma and the other members of the conspiracy, the government obtained wiretap authorization for the telephones of Aguilera and Valencia. The roughly 650 conversations intercepted yielded evidence of eighteen separate narcotics transactions over the five-month period from January through May 1994. In January 1995, a Grand Jury returned a 66–count superseding indictment against a total of sixteen individuals for various narcotics crimes arising from the conspiracy.[3] The eight Defendants–Appellants here were tried jointly, and following a five-week jury trial, commencing February 22, 1995, all eight were found guilty on April 4, 1995, of conspiracy to distribute cocaine and marijuana.[4] At Defendants' trial, 428 of the approximate 650 conversations which had been taped were introduced and received into evidence. In addition to the conspiracy

---

1. Rosa on occasion supplied Toma with cocaine as well.

2. A "pen register" allows the FBI to determine the number called by the phone, as well as the time, date, and duration of the calls during the time frame authorized.

3. Defendants were charged under 21 U.S.C. §§ 841(a)(1)(A), 843(b), 846, and 848(a), as well as 18 U.S.C. §§ 2 and 924(c).

4. Seven other individuals named in the superseding indictment either pled guilty, or had their trials severed from the other Defendants, and one individual named in the indictment (Matthews) became a fugitive.

charge, the jury found each Defendant guilty of at least one other count in the indictment. Defendants have individually and jointly challenged their convictions and sentences.

## II. Issues on Appeal

I. Whether the district court's rulings denying Defendants' motions for a mistrial and for a voir dire of the jury were proper;

 A. Defendants' motion for mistrial;

 B. Defendants' motion for voir dire of the jury;

II. Whether the district court properly denied Defendants' motions for severance;

 A. Defendants' motion for severance based on alleged variance between indictment and proof at trial;

 B. Whether the indictment was duplicitous;

 C. Pinto's motion for severance based on alleged exculpatory testimony;

III. Whether the district court erred in denying Defendants' motions for mistrial based on alleged prosecutorial misconduct;

 A. Alleged "coaching" of witness Youmaran;

 B. Alleged "coaching" and subornation of perjury by Ishu;

 C. Alleged subornation of perjury by witness Ress;

 D. Questioning concerning arson at a building owned by Aguilera and Iturralde;

IV. Whether sufficient evidence supported the convictions of various Defendants;

 A. Rosa;

 B. Rabon;

 C. Pinto;

V. Whether the district court's enhancement of Toma's sentence under § 3B1.1(a) of the Sentencing Guidelines was proper;

VI. Whether the district court's attribution of certain drug quantities to Toma for sentencing purposes was proper;

VII. Whether the trial court properly declined to grant additional peremptory challenges to Defendants;

VIII. Whether the district judge's ruling admitting tape recordings based on the identification of the voices of Aguilera and Iturralde was proper;

IX. Whether the trial judge erred in declining to give Ameneiro's proposed instruction concerning the reliability of voice identification;

X. Whether the mandatory minimum sentence Rabon received is constitutional; and

XI. Whether the district court's refusal to permit Rosa to collaterally challenge a prior conviction used to enhance his sentence was proper?

*I. Whether the district court's rulings denying Defendants' motions for a mistrial and for a voir dire of the jury were proper.*

On appeal, Defendants initially argue that the judge erred in denying their motion for a mistrial, and in refusing to conduct a voir dire of the jury, based on the presence in the jury room of transcripts of certain tapes which had been admitted in evidence but never played at trial.

A. Defendants' motion for mistrial

During her testimony, government witness Ress authenticated a number of the tapes the government introduced in evidence. She testified that she was familiar with the voices of Defendants (except Aguilera and Iturralde), and further that she had reviewed the transcripts. She testified that the transcripts accurately reflected the conversations on the tapes (except the Spanish tapes, as Ress did

not speak Spanish) and also properly identified the speakers on the tapes.

During the trial, the government played only 428 of the roughly 650 tapes received in evidence, leaving more than 200 unplayed. The tapes played were of conversations in either English, Spanish, or Assyrian. The jury was provided a binder during trial which contained transcriptions of all of the roughly 650 recorded conversations, and which they were referred to and examined while tapes were being played.

Four days prior to closing arguments, the trial judge discussed with the lawyers out of the jury's presence which exhibits would be given to the jury for consideration during deliberations. Some of Defendants' lawyers sought to bar the jury from receiving transcripts of the English-language tapes, but the trial judge overruled their objections, ruling that, since there had been so many tapes played throughout the course of the trial, all of the transcripts, whether they were of English or foreign-language conversations, would be made available to the jury during their deliberations.[5] At that time, the judge also directed the respective attorneys to place the tapes and transcripts on a table, in order that they would be available to all of them for inspection prior to their submission to the jury. The trial judge specifically informed all of the attorneys for both sides that he expected them to review the exhibits prior to them being given to the jury and stated, "[s]o if there is any question, it can be raised before the marshall takes the material to the jury room."

Four days later, on the day scheduled for closing arguments, the judge met with the lawyers to review the proposed instructions and hear and rule on any final objections. At that time, counsel for Iturralde and counsel for Rabon objected to eight specific tapes and transcripts being given to the jury on the ground that the tapes were not played during trial. The government responded that, since all of the tapes and transcripts had previously been admitted in evidence, they should be available for the jury. The court agreed with

the defense lawyers and sustained the objections to the eight tapes. While acknowledging that all tapes and transcripts had been admitted in evidence, the judge nonetheless stated: "if [the government] never presented [the unplayed tapes and corresponding transcripts] to them, why should they listen to them, or why should they be sent back to them?" The judge ordered the government to remove those eight transcripts from the books, and the government complied with the judge's order. Immediately thereafter, counsel for Magana observed that there were a number of other tapes which, though admitted in evidence, had not been played, and for which the jury had not reviewed the corresponding transcripts. The following colloquy between Judge Hart and counsel for Magana then occurred:

> [COUNSEL FOR MAGANA]: It seems, your Honor, that there are a number of tapes and transcripts in there that if they didn't play the tape, then they ought to remove them all.
>
> THE COURT: Well, you tell us which ones they are. I know you have been following the case with great care, as well.
>
> [COUNSEL FOR MAGANA]: I have, your Honor. I am just saying there are quite a few. Those that apply to other people, I haven't, but the government knows.
>
> THE COURT: I tried to keep track of them. I am sure you did, as well. So let me know if there is a problem.

(Tr. at 2832–33.) No further discussion was had about the tapes and transcripts prior to the commencement of the jury deliberations.

On the second full day of deliberations, the jury sent a note to the judge, asking: "Is it correct that all transcripts and notebooks are in evidence even though the related tape is not in the jury room?" At that time, the court learned that, except for the eight tapes and transcripts which he had specifically ordered removed, the transcripts for the approximately 200–plus unplayed tapes that had been received in evidence had not been removed from the binders which had been

---

5. This ruling, which Defendants do not challenge, was clearly proper. *See United States v. Doerr*, 886 F.2d 944, 966 (7th Cir.1989) ("[A]l- lowing the jury to have the transcripts during their deliberations, as well as when the tapes are played during the trial, is not error.").

sent back to the jury room. However, the unplayed tapes themselves were not made available to the jurors.

At this time, the judge questioned the government's lawyers, who explained that they interpreted the court's prior order as requiring them to only remove the eight specific tapes and transcripts objected to by counsel for Rabon and Iturralde.[6] The lawyers for the government reiterated that the tapes and transcripts at issue had been admitted in evidence prior to trial. The prosecutors further acknowledged that they were aware that the judge did not want transcripts of unplayed tapes sent to the jury, however they did not believe they had enough time to go through all of the jury's binders and remove the 200–plus transcripts prior to the commencement of deliberations. The district court stated that the fact that it was "administratively inconvenient" was "no excuse" for the government's failure to remove the transcripts. Defendants all moved for a mistrial based on the presence of the transcripts in the jury room.

Despite his displeasure with the actions of the government lawyers, the district judge denied Defendants' motion for a mistrial. In his ruling, he agreed with the government and noted that the transcripts at issue had all been admitted in evidence, and that based upon this, there would have been no question had the government played the tapes that the jury would have had all of the transcripts for review. He also observed that none of Defendants had specifically moved for the exclusion of the transcripts of the unplayed tapes, though he commented that he would probably have granted such a motion had it been made in a proper and timely manner. Defense counsel for Magana asserted that the court's response to his prior objection placed the responsibility on the government to remove all transcripts of unplayed tapes. In response, the judge stated:

> I gave you [defense counsel] that responsibility. I said it on the record. Check those [binders] yourselves. Be sure that

what goes back is correct. That is your responsibility as attorneys to do that. You can't cast that entirely on the government. The fault lies both on the government and the defense counsel.

(Tr. at 3315.) Judge Hart then ruled that the jury would be sent home for the day, and at that time he ordered the marshall to retrieve all binders from the jury room and instructed the attorneys (both government and defense counsel) to remove all transcripts from the binders which referred to tapes that had not been played during trial.

When the trial reconvened after the transcripts in question had been removed, the judge responded to the jury's question by giving this curative instruction:

> You have all the English-language tapes that are in evidence.
>
> Some transcripts were inadvertently provided to you for tapes that were never played. During the weekend, all of those transcripts were removed from your transcript notebooks. If, during deliberations, you read a transcript for which there was no tape, you must disregard what was in that transcript. It may not be considered in reaching your verdict.

(Tr. at 3339.) When Defendants renewed their motions for a mistrial, the judge once again made clear that he would not declare a mistrial. He agreed with Defendants that the transcripts of unplayed tapes should not have been sent back to the jury room; however, he reiterated that the transcripts contained information which the government could have placed before the jury had the tapes been played. He also concluded that the government's decision not to play the tapes spared the jury from hearing "cumulative" material, and he suggested that the fact that the jury alertly picked up on the absence of certain tapes meant that they were following instructions by listening to the tapes, and not referring to the transcripts alone. Finally, he reiterated his belief that the defense lawyers shared the responsibility for the episode, since he had specifically di-

---

6. Explaining his understanding of Judge Hart's order, the Assistant United States Attorney stated: "Your Honor specifically, I thought, said you only have to pull those ones that defendants objected to. So we sent back the transcripts as they were there with the exception of those transcripts [that were specifically objected to]." (Tr. at 3303.)

rected them to review all the evidence that was being given to the jury prior to its submission. Judge Hart also declined, in response to the defense lawyers' requests, to conduct a voir dire of the jurors concerning whether they had looked at the transcripts and what, if any, effect those transcripts had on their deliberations.

■ Defendants argue that the judge should have granted their motion for a mistrial based on the presence of the transcripts of admitted but unplayed tapes in the jury room. We review the denial of a motion for mistrial under the abuse of discretion standard. *United States v. Best*, 939 F.2d 425, 431 (7th Cir.1991) (en banc).[7] Under the abuse of discretion standard, "the proper inquiry is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather whether any reasonable person could agree with the district court." *Id.* at 429 (internal quotation marks omitted).

■ Throughout their briefs and at oral argument, Defendants have repeatedly suggested that the government's actions in failing to remove the transcripts of unplayed tapes from the binders sent back to the jury room amounted to deliberate prosecutorial misconduct. We see no need to discuss this allegation. Even if a defendant alleges that improper material was before the jury as a result of prosecutorial misconduct, he must still show "that there was some prejudice or substantial right affected by the presence" of the transcripts in the jury room. *Best*, 939 F.2d at 431. As discussed below, Defendants in this case have failed to demonstrate that they were prejudiced in any way by the presence of the transcripts of the unplayed tapes in the jury room.

■ As an initial matter, we observe that Defendants failed during trial to make a timely and *specific* motion requesting that all the tapes which had been admitted in evidence but not played not be presented to the jury for deliberation, and that the corresponding transcripts of those tapes be removed from the binders and not be displayed to the jury. Counsel for Magana did not object nor did he argue until the day scheduled for closing arguments, nearly five weeks after the commencement of the trial, that there were "a number" of tapes that had not been played and should be removed, and the judge responded that, if counsel sought to have any tapes in particular removed, he was directed to bring those particular tapes to the court's attention prior to their submission to the jury. Thereafter, with the exception of the eight specific tapes and transcripts objected to by counsel for Rabon and Iturralde, which were removed by the government, neither counsel for Magana, nor any of the other defense lawyers, explicitly requested that the judge remove any other unplayed tapes and corresponding transcripts. Second, as Judge Hart noted, he *specifically* instructed the lawyers for both sides when he conferred with them concerning the final jury instructions, four days prior to the date of closing argument, to place all of the exhibits introduced on a table in the court, and directed them to review the exhibits prior to their submission to the jury so that they could examine the material and object if such was proper. It appears that counsel for Iturralde and Rabon were attentive to which tapes had not been played, as they objected to eight specific tapes and transcripts prior to closing arguments, and as a result those

7. In discussing our standard of review on this issue, both Defendants and the government in their briefs cite our cases in which material that had not been admitted in evidence was present in the jury room. *See, e.g., United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir.1989) ("A criminal defendant in our system has 'a right to be tried on the basis of the evidence admitted at his trial, and this right may be violated if the jury gets access to *extra-record* evidence ... even if the access is not the result of any prosecutorial misconduct.'") (quoting *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982) (emphasis added)). But these cases are not quite on-point, since the transcripts at issue here were not "extra-record evidence," as they had been admitted into evidence during trial. Thus, the trial judge could, in his discretion, opt to send transcripts back to the jury. *See United States v. Doerr*, 886 F.2d 944, 966 (7th Cir.1989) ("Trial courts possesses [sic] wide discretion in determining whether to allow juries to use written transcripts as aids in listening to audio tape recordings. In addition, we have previously held that allowing the jury to have the transcripts during their deliberations as well as when the tapes are played during the trial, is not error." (citations omitted)).

tapes and transcripts were removed. It also appears, however, that none of the other defense lawyers examined the exhibits to discover and identify the numerous transcripts of unplayed tapes which should have been excluded. Given that over 200 tapes were not played at trial, even a cursory examination of the transcript binders at some point over the four-day period would certainly have revealed the presence of the transcripts of unplayed tapes. In this regard, we observe, as we have in the past, that "it is not the responsibility of the prosecutor or the judge to do the work of the defense counsel." *United States v. Zambrana*, 841 F.2d 1320, 1328 (7th Cir.1988).

Further, as the trial judge observed, the transcripts and tapes had been properly admitted in evidence. We have observed in the past that " '[c]ourts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to tape recordings.' " *Id.* at 1335 (quoting *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985)). Indeed, we have specifically approved of the practice of sending transcripts back to the jury room. *See United States v. Crowder*, 36 F.3d 691, 697 (7th Cir.1994) ("The decision to allow the transcripts to be used during deliberations is committed to the sound discretion of the district court."). Therefore, had the government opted (as it could have done) to play all 650 of the tapes during trial, there would have been no question but that the transcripts could have gone to the jury without any further discussion. Thus, this situation presents a far less compelling case for a finding of prejudice than prior cases before this court, in which material extraneous to the admitted evidence was placed before the jury. For example, in *United States v. Sababu*, 891 F.2d 1308 (7th Cir.1989), we held that it was not an abuse of discretion for the trial judge to refuse to declare a mistrial where a transcript of a taped conversation which had been *excluded from evidence* was inadvertently sent back to the jury room. 891 F.2d at 1333–34. As we stated in *Best*: "If exposure to such improper evidence did not warrant a new trial in ... [cases where the jury was exposed to improper evidence], the jury's exposure in this case to copies of documents *properly*

*admitted in evidence* in a binder that the jury had used for the length of the trial cannot warrant a new trial." 939 F.2d at 431 (emphasis in original) (citing, *inter alia*, *Sababu*). Defendants have made no effort to delineate anything in these transcripts which contained material prejudicial to them.

■ Finally, even assuming that the transcripts were improperly before the jury, the trial court gave a curative instruction specifically informing the jurors that the transcripts for tapes which had not been played had been removed, and if they had read any such transcripts prior to their removal, "you must disregard what was in that transcript. It may not be considered in reaching your verdict." Thus, the instruction specifically directed the jury not to consider any of those transcripts in reaching their verdicts. As a jury is presumed to follow the court's instructions, *see Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir.1988), and since Defendants have failed at any time (including on appeal) to offer any evidence that any of the material contained within the transcripts was prejudicial, we refuse to conclude that Defendants suffered any prejudice as a result of the presence of the transcripts in the jury room.

B. Defendants' motion for voir dire of the jury

■ We likewise disagree with Defendants' contention that the trial judge erred in refusing to conduct an individual voir dire of the jurors to determine the potential prejudicial impact of the transcripts. Trial judges are vested with wide latitude with respect to remedying the potential prejudicial influence that may arise when jurors are exposed to improper information, and the district court's decision not to conduct a voir dire will only be reversed for an abuse of discretion. *Sababu*, 891 F.2d at 1334; *see United States v. Carson*, 9 F.3d 576, 589 (7th Cir.1993).

When refusing to conduct a voir dire of the jury, the experienced trial judge noted that the defendants had failed to delineate any specific examples of prejudicial material in those transcripts. This was particularly noteworthy since defense counsel had an op-

portunity *at the time the tapes and transcripts were admitted* to argue that they contained irrelevant or prejudicial information, and were specifically told four days prior to the start of closing arguments to inspect the exhibits that were being sent back to the jury. Furthermore, the trial judge observed that conducting a voir dire of the jury during deliberations can be "fraught with problems," since it could cause the jurors to focus disproportionately on the removed material. This court has noted its agreement with this observation in the past. In *Sababu*, we observed that such a voir dire could conceivably jeopardize an accused's rights, because it is possible that polling jurors individually could cause " 'the jurors polled to attach undue significance to the incident.' " 891 F.2d at 1334 (quoting *United States v. Williams*, 822 F.2d 1174, 1189–90 (D.C.Cir.1987)). As in *Sababu*, in this case we conclude that the trial court did not commit error in refusing to conduct a voir dire and deciding instead to give a curative limiting instruction.

## II. Whether the district court properly denied Defendants' motions for severance

**A. Defendants' motion for severance based on alleged variance between indictment and proof at trial**

During the time period the FBI was investigating Toma, the Drug Enforcement Administration (DEA) was investigating Aguilera and Iturralde. Pursuant to the DEA's investigation, Jorge Tutuianu (Tutuianu), a former narcotics dealer working for the government, obtained a position at the Alamedas Casino, a nightclub owned by Aguilera and Iturralde. Tutuianu introduced Aguilera to DEA agents Juan Perez (Perez) and Frank Guerra (Guerra), who were posing as major suppliers of narcotics, for the purpose of setting up a potential 100–kilogram shipment of cocaine. The government agents were posing as sellers, rather than buyers, of narcotics, and this was referred to at trial by the government's witnesses Perez and Guerra as a "reverse buy."

On appeal, Defendants argue that this specific proposed transaction was a separate conspiracy as distinguished from the general conspiracy among Defendants to distribute cocaine and marijuana. Defendants claim that, since the proof at trial demonstrated the existence of separate conspiracies while the indictment charged only one overarching conspiracy, there was a "variance" between the indictment and the proof presented at trial. We disagree.

■ We observe as an initial matter that, except for Pinto, Ameneiro, and Rosa, none of Defendants properly preserved the severance issue for appeal; thus we review this issue with respect to all other Defendants under the "plain error" standard. *United States v. Balzano*, 916 F.2d 1273, 1279–80 (7th Cir.1990). To prevail under this standard, a defendant must demonstrate that the error is obvious, prejudicial, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732, 736, 113 S.Ct. 1770, 1777, 1779, 123 L.Ed.2d 508 (1993).

■ "A variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *United States v. Townsend*, 924 F.2d 1385, 1389 n. 1 (7th Cir.1991). "A defendant asserting a claim of variance will succeed in obtaining reversal of his conviction only if he establishes that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance." *United States v. Curtis*, 37 F.3d 301, 305 (7th Cir.1994).

"The Seventh Circuit defines a conspiracy as a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Rodriguez*, 53 F.3d 1439, 1444 (7th Cir.1995) (internal quotation marks omitted). In *United States v. Briscoe*, 896 F.2d 1476 (7th Cir.1990), this court reviewed what is necessary to establish a *single* conspiracy:

"Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small number of co-conspirators, other parties who knowingly participate with these co-conspirators

and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."

896 F.2d at 1505 (quoting *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969)). We went on to observe in *Briscoe*:

It is well settled that a single conspiracy may consist of a small core of people with whom other conspirators knowingly participate to achieve the common purpose of the conspiracy. *It is equally well established that the parties involved in a single conspiracy need not know one another or participate in every aspect of the conspiracy....* In any case, as long as the evidence demonstrates that the coconspirators ... knowingly embraced a common criminal objective, this is sufficient to establish the existence of a single overall conspiracy among the coconspirators.

896 F.2d at 1507 (citations and internal quotation marks omitted) (emphasis added). Finally, in *United States v. Gonzalez*, 933 F.2d 417 (7th Cir.1991), we addressed the manner in which this court reviews an argument alleging a variance between the indictment and the proof at trial:

"In performing a variance review we do not comb the evidence *de novo*, as the appellants might like. Our review is second-hand. The jury gets first crack at deciding 'whether there is one conspiracy or several when the possibility of a variance appears.' *United States v. Percival*, 756 F.2d 600, 609 (7th Cir.1985). This is so because a question of variance is a question of fact, which is something especially within the jury's realm of expertise.... At this stage the question for us simply is whether the evidence is sufficient to support the jury's determination. *We must view the proof at trial in the light most favorable to the prosecution, and we must uphold the jury's single conspiracy determination if any rational trier of fact could have found beyond a reasonable* doubt the one conspiracy. *"We give deference to the jury's weighing of the evidence and its drawing of reasonable inferences."* [*United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989) ]. This deference is significant: Given the nature of conspiracies, juries often must infer their existence and scope from circumstantial evidence and 'the reasonable inferences drawn therefrom.' "

933 F.2d at 438 (quoting *United States v. Paiz*, 905 F.2d 1014, 1019 (7th Cir.1990)) (emphasis in original).

Whether to grant a motion to sever the trials of joint defendants alleged to have participated in a single conspiracy is a matter within the sound discretion of the trial judge, and we will reverse a decision denying severance only when such denial amounts to an abuse of that discretion. *Sababu*, 891 F.2d at 1330–31. To succeed on appeal, Defendants bear the heavy burden of demonstrating that they were in fact prejudiced by the denial. *Id*. In this context, "prejudice" does not mean that their odds of acquittal would have been increased; rather, Defendants must demonstrate that, absent the severance, they were unable to obtain a fair trial. *Id*.

When reviewing the decision of the trial court denying a motion for severance, we keep in mind, particularly in conspiracy cases, that there is a strong interest in trying defendants who have been jointly indicted in a single trial. *Id*. As we explained in *Briscoe*, those interests include: (1) reducing expenditure of judicial and prosecutorial time; (2) preventing the increased demand on witnesses' time that would result from multiple trials; (3) reducing the chance that each defendant will try to create reasonable doubt by blaming an absent colleague. 896 F.2d at 1516–17 (citing *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.1987)).

The taped conversations which evidenced the transactions comprising the conspiracy reflect that the co-conspirators did not specifically refer to cocaine as such; rather, they referred to the narcotics transactions in code language. During trial, Agents Guerra and Perez, as well as Defendant Pinto, testified

concerning the content of the code used by Defendants.[8] In *United States v. Vega,* 860 F.2d 779 (7th Cir.1988), we had occasion to discuss the use of such "drug code" in the narcotics trade and how it may be considered at trial:

> Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words. In this case the jury was confronted with conversations which contained "code words" that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can be clearly seen to be "code words" for drugs. *See generally United States v. Abascal,* 564 F.2d 821, 827 (9th Cir.1977) ("The conversing conspirators frequently discuss non-narcotic-related matters at the beginning of conversations, and often resorted to jargon and code words, a frequent practice in narcotics dealings"); *United States v. Chavez,* 533 F.2d 491, 494 (9th Cir.1976) ("Jargon and code words are commonly used by those dealing in illicit drugs and were employed here") (citation omitted).... Not only are code words always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted, such terms were obviously used by the conspirators in this case.

860 F.2d at 795 (internal quotation marks omitted). We have also observed that " '[j]udges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world.' " *United States v. Nobles,* 69 F.3d 172, 191 (7th Cir.1995) (quoting *United States v. Hatchett,* 31 F.3d 1411, 1420 (7th Cir.1994)).

▮▮▮ After review of the record, we are of the opinion that the government presented more than sufficient evidence of a single conspiracy. With respect to Aguilera, Iturralde, Rabon, and Magana, who served as Toma's suppliers, Toma engaged in frequent conversations with each concerning the specifics of a variety of proposed and past drug transactions.[9] Toma also dealt in "fronted" narcotics with them, reflecting a sense of interdependence among the various stages of the conspiracy network, and establishing more than a mere "buyer-seller" relationship. *See United States v. Lechuga,* 994 F.2d 346, 349–50 (7th Cir.1993) (fronting of narcotics is evidence of more than a simple buyer-seller relationship). Toma's load cars were used to transport narcotics, and the suppliers would in fact deal directly with Toma's customers on occasion. As to Rosa, his frequent transactions with Toma not only took the form of both buyer and seller, they extended beyond that as well. Toma on occasion while actively participating in the conspiracy counted drug money at Rosa's house, and also "cut," i.e., diluted for resale, quantities of cocaine there. Rosa also spoke with Magana and Matthews, as reflected in taped conversations, on occasion concerning narcotics transactions. Finally, Ameneiro received fronted drugs from Toma, spoke with Ress and Ishu concerning narcotics transactions on occasion, and in one instance dealt directly with Ishu, when Ishu, acting on Toma's instruction, visited Ameneiro to pick up drugs which Toma had previously fronted to Ameneiro and which Ameneiro was returning because of their poor quality.

Further, review of the specifics of the "reverse buy" transaction falls short of convincing us that it constituted a wholly separate conspiracy from the overall conspiracy charged in the indictment. On May 6, Perez spoke with Aguilera, who indicated that he needed "100 women." According to Perez, "100 women" was an example of the code language employed as a reference to "100 kilos" of cocaine. Afterwards, Aguilera spoke with Pinto, and Pinto and Aguilera arranged to meet and did in fact meet at a park on the north side of Chicago. On May

---

8. Examples of code words commonly used in narcotics conspiracies include "tickets," "broads," "girls," "ladies," "women," or "cadillacs," which refer to kilos of cocaine; "paper" or "receipts," which refer to money used for the purchase of narcotics, and "dances" or "concerts," which refer to drug deals.

9. Although Pinto did not deal with Toma directly, his role in the scheme will be discussed below.

9, Aguilera called Perez back, and stated that they could come up with "half." On May 10, Aguilera called Pinto and told him that "I'm waiting for them to call ... I think he has a concert ready." Pinto, when he testified, admitted that he was aware that "concert" was code for a cocaine transaction. Immediately after Aguilera called Pinto, Perez spoke with Aguilera and told him that "the man is on his way." Aguilera assured Perez that he had things "under control," and that he could move those "100 ladies" in "one month maximum." Immediately thereafter, Aguilera called Pinto and arranged to meet at a park in Chicago, and Pinto later admitted under oath that he attended that meeting.

After the meeting, Aguilera called Toma and informed him that he had "good news" and they arranged to meet. The next day, Guerra met with Tutuianu, Aguilera and Iturralde at a bar, where they agreed, pursuant to their earlier discussion, that Guerra would deliver the cocaine, but Guerra insisted on getting $200,000 up front (about half of the purchase price). They also agreed on the use of a load car, i.e., a car with a secret compartment specifically designed for transporting the drugs.

On May 12, Aguilera called Toma, who had a number of "load cars," and told him that he needed to use Toma's "car." Toma later called Matthews and told Matthews that he was going to see "the tickets," and was going to lend his car to his supplier. Toma also requested that Matthews bring him some money to show Guerra. Later, Aguilera, Iturralde and Tutuianu arrived at the same park where Aguilera had met with Pinto two days earlier. Toma arrived driving one of his "load cars." Ultimately, no deal was consummated at that time, as Toma did not have the $200,000 available for display. The meeting broke up, and Defendants were arrested the next day, on May 13.

A variance occurs only when the "evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Johnson*, 26 F.3d 669, 686 (7th Cir.1994). "Whether a single conspiracy exists is a question of fact; consequently the jury gets first crack at deciding whether there is one conspiracy or several

when the possibility of a variance appears. This is because the jury's verdict must be interpreted as a finding that the government presented sufficient evidence to prove its indictment beyond a reasonable doubt, and that is all that we require of the prosecution." *Townsend*, 924 F.2d at 1389 (citations and internal quotation marks omitted). In this case, the evidence revealed a series of interrelated drug credit transactions between Toma, his suppliers and his customers, over a period spanning the early months of 1994. It also revealed that the network of suppliers and dealers were aware of each other's existence, dealt with each other not just through Toma, but also on occasion with each other directly, employed a similar drug code, and used the same meeting places, and modes of transportation at times to further their transactions. Further, with respect to the "reverse buy" transaction, it in no way appears to be out of the ordinary for the conspiracy. One of Toma's suppliers (Aguilera) sought to acquire cocaine to deliver to Toma, who was in the process of making arrangements to deliver the cocaine to one of his suppliers (Matthews). Based on the foregoing review of the record, we conclude that the evidence supported the jury's conclusion that a single conspiracy existed among Toma and the other coconspirators, and Defendants were not prejudiced by the district judge's refusal to grant severances based on any alleged variance.

Furthermore, the trial judge, in instructing the jury on the law of conspiracy, gave explicit and thorough limiting instructions as follows:

> Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so, you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.
>
> . . . .
>
> Mere association with the conspirators is not sufficient to establish a defendant's participation or membership in a conspira-

cy. Presence at the scene of a crime and/or knowledge that a crime is being committed are not sufficient to establish a defendant's guilt.

In Count 1 the government has charged a single conspiracy. You are instructed that proof of several separate conspiracies is not proof of the single overall conspiracy alleged in Count 1, unless one of the several conspiracies which is proved is the single conspiracy which Count 1 of the indictment charges.

What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy and is not also a member of the conspiracy charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must find that he was a member of the conspiracy charged in the indictment, whether or not he was a member of some other separate conspiracy.

(Tr. at 3167, 3171–72.) As in *United States v. Collins*, 966 F.2d 1214 (7th Cir.1992), a case in which a similarly thorough limiting instruction was given, the instruction here "adequately informed the jury that it must find each defendant guilty of the conspiracy charged, a single conspiracy ... in order to convict that defendant." 966 F.2d at 1221. It is evident that the jury was careful in its consideration of the evidence with respect to the individual counts and Defendants, since, while finding Defendants guilty of a number of counts in the indictment, it also found a number of Defendants not guilty on various charges. For example, Toma was acquitted of one count of cocaine distribution (Count 3), and another count of attempted cocaine distribution (Count 53). With respect to Count 53, the jury found other Defendants guilty. The jury also found Magana not guilty of one count of cocaine distribution (Count 21), and

found all Defendants charged not guilty of Count 66, alleging use of firearms. For the reasons discussed, we conclude that no prejudice resulted to Defendants from any alleged variance.

B. Whether the indictment was duplicitous

 Defendants further argue that, because the indictment did not set out the "reverse buy" transaction in a separate conspiracy count from the main conspiracy alleged, the indictment was "duplicitous." "'Duplicity' is the joining of two or more offenses in a single count." *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir.1996) (citation omitted). We initially observe in response that none of Defendants raised the question of duplicity before trial, and thus they "waived this argument by failing to raise it prior to trial." *United States v. Hammen*, 977 F.2d 379, 382 (7th Cir.1992). While we may review waived arguments for "plain error," we are not obligated to do so. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). Under this standard, defendants must establish "'that there was error, that the error was plain, that the error affected [their] substantial rights, and that the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir.1996) (quoting *United States v. Penny*, 60 F.3d 1257, 1264 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996)).

Review of Defendants' argument concerning the alleged "duplicity" makes clear that it is little more than a rehash of their variance argument—that the evidence at trial showed that the "reverse buy" was a separate conspiracy. Indeed, even the case law cited by Defendants actually deals with the question of variance. For example, Defendants in their brief cite *United States v. Zemek*, 634 F.2d 1159 (9th Cir.1980), as setting forth factors a court should consider "[i]n determining whether a single conspiracy charge is duplicitous." (Joint Br. of Defendants at 48.) In fact, the Ninth Circuit specifically stated in *Zemek* that the factors it was setting forth were in response to the defendants' *variance* argument. 634 F.2d at 1167 ("Appellants

assert that, while count 1 alleged but a single conspiracy, the evidence adduced at trial established two separate conspiracies *resulting in a variance* affecting their substantial rights." (emphasis added)). In *United States v. Simone*, 931 F.2d 1186 (7th Cir.1991), this court was faced with a situation similar to the present case. Defendants were charged with and convicted of a single count of conspiracy, and they argued on appeal that the evidence at trial showed that more than one conspiracy existed. In reviewing the indictment, we concluded that it "described a single ongoing drug distribution conspiracy ... involving core members who bought from and sold to various suppliers and dealers.... This circuit has treated such schemes as single conspiracies rather than a series of smaller separate conspiracies." 931 F.2d at 1192 n. 6. Here, the indictment likewise described a single set of participants who engaged in repeated transactions from April 1993 through May 1994. We have previously determined, *supra*, that the evidence at trial was sufficient to establish that the "reverse buy" transaction was part of the single, overarching conspiracy charged in the indictment, because the evidence showed that it was but another example of the many transactions which made up the single conspiracy. Thus, it was clearly proper for the indictment to charge but one conspiracy, since only one existed, and Defendants have failed to demonstrate plain error with respect to their argument that the indictment was duplicitous.

C. Pinto's motion for severance based on alleged exculpatory testimony

Several weeks prior to trial, Pinto made a motion for severance and it was denied. Approximately two weeks into the trial, he renewed his motion, this time accompanied by an affidavit from one of the Co-Defendants, Aguilera. In the affidavit, Aguilera stated that:

I would be willing to testify if Mr. Pinto has a separate trial, since I have knowledge of facts which would show that Jose Pinto is not guilty of the charges in this case. Mr. Pinto has never supplied me with any cocaine. I have never received any cocaine from Mr. Pinto at any time.

(R.545.) Judge Hart denied the motion, and Pinto argues that the denial of his motion prejudiced his right to a fair trial.

When a defendant requests a severance based upon an allegation that a co-defendant will offer exculpatory testimony, the district court considers: "(1) whether the co-defendant's testimony would be exculpatory; (2) whether the codefendant would in fact testify; and (3) whether the testimony would bear on defendant's case." *Granada v. United States*, 51 F.3d 82, 84 (7th Cir.1995) (quoting *United States v. Chrisman*, 965 F.2d 1465, 1476 (7th Cir.1992)), *cert. denied,* —— U.S. ——, 116 S.Ct. 970, 133 L.Ed.2d 890 (1996). We review the trial judge's denial of a motion for severance for an abuse of discretion, *see United States v. Boykins*, 9 F.3d 1278, 1289 (7th Cir.1993), *cert. denied,* —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 348 (1997), keeping in mind the strong interest in joint trials in conspiracy cases. *Granada*, 51 F.3d at 84; *Briscoe*, 896 F.2d at 1516–17; *see supra* 1186.

In our opinion, the trial judge did not abuse his discretion in denying Pinto's motion for severance, since Aguilera's affidavit fails to satisfy even the first prong of the above test. The fact that Aguilera claimed that Pinto never delivered cocaine to him simply does not exculpate Pinto of the charges set forth against him in the indictment. Pinto was charged not with *actual* delivery of cocaine, but with attempted distribution of cocaine, as well as being a member of the conspiracy to distribute cocaine. Furthermore, the evidence against Pinto was not based on actual observance of delivery of narcotics, but rather on his phone conversations that were recorded in which narcotics deals were discussed. As the trial court noted in denying Pinto's motion:

the problem ... with your motion [for severance] is that ... Mr. Pinto, is charged with conspiracy. He is charged with attempt. And he is charged, as well, with telephone charges which could conceivably be proven without actually establishing a distribution.... Mr. Aguilera's testimony, *although it might be helpful to*

*him, would not be exculpatory or operate to exonerate him.*

Indeed, all Aguilera's affidavit stated was that "Mr. Pinto has never supplied me with any cocaine. I have never received any cocaine from Mr. Pinto at any time." This would not be inconsistent with participation by Pinto in a narcotics conspiracy, an *attempted* (though not actual) delivery of drugs by Pinto, or even with a theory that Pinto actively supplied cocaine to people other than Aguilera in furtherance of the conspiracy.

A similar issue was presented to us in *Gonzalez*, 933 F.2d 417. In that case, a defendant had been charged with making a trip to Chicago in furtherance of a narcotics conspiracy. He requested a severance on the basis of affidavits from his alleged co-conspirators stating that, during the time of the conspiracy, the defendant had traveled to Chicago for legitimate business reasons. We held that since "neither of the affidavits contained statements that *excluded the possibility* that [defendant] also traveled to Chicago *on drug-related business*," they did not exculpate the defendant. 933 F.2d at 425 (emphasis added).[10] Likewise, in the present case, Aguilera's affidavit did not exculpate Pinto, since it did not contain testimony inconsistent with the charges Pinto faced. Thus, since it is not truly exculpatory, the affidavit simply fails to provide a basis sufficient for concluding that Judge Hart abused his discretion in denying Pinto's renewed motion for severance.

III. *Whether the district court erred in denying Defendants' motions for mistrial based on alleged prosecutorial misconduct*

Defendants also claim that they were entitled to be granted a mistrial based upon several instances of alleged "prosecutorial misconduct." In particular, they claim that the prosecution: coached witness Youmaran

into making a false and perjurious in-court identification of Defendant Ameneiro; coached witness Ishu into making a false identification of Ameneiro and suborned perjury with respect to Ishu's testimony concerning a meeting with Ameneiro; knowingly presented false testimony by witness Ress; and improperly questioned a witness concerning arson at a building owned by Aguilera and Iturralde. We address each in turn.[11]

■ In *United States v. Saadeh*, 61 F.3d 510 (7th Cir.1995), we addressed the quantum of proof a defendant must establish to succeed when making a claim that he was entitled to receive a new trial on the basis that the government knowingly used perjured testimony:

> In order to receive a new trial on the basis of the government's use of allegedly perjured testimony, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury. We have repeatedly held, however, that mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony. Rather, the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence. Finally, when a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination.

61 F.3d at 523 (citations and internal quotation marks omitted).

A. Alleged "coaching" of witness Youmaran

■ Youmaran testified that he accompanied Toma on two occasions in March or

---

10. *See also United States v. Williams*, 31 F.3d 522, 527–28 (7th Cir.1994) (where testimony of codefendants would not exonerate defendant, trial court decision to deny severance was proper).

11. In their brief, Defendants have sought to frame their asserted entitlement to relief in terms of "outrageous government conduct," but that doctrine has been explicitly rejected by this cir-

cuit (almost a full year prior to the submission of Defendants' brief) in *United States v. Boyd*, 55 F.3d 239 (7th Cir.1995). In *Boyd*, we stated that "[t]he gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights[.]" 55 F.3d at 241 (emphasis supplied).

April 1994 to Ameneiro's tanning salon for the purpose of attempting to obtain payment from Ameneiro for cocaine previously delivered by Toma, but that Ameneiro refused to pay on either occasion. Youmaran testified that he knew Ameneiro, and he identified him in court.

During the cross-examination of Youmaran, Ameneiro's lawyer suggested that the government had "coached" Youmaran's testimony by displaying a photo of Ameneiro two days prior to trial and telling him to identify Ameneiro when asked. Defendants argue that, since Youmaran was shown a photo of Ameneiro prior to trial, his in-court identification of Ameneiro was "coached" and was inaccurate. This argument, however, is based on a self-serving and selective view of the record. During re-direct examination, Youmaran made clear that he had been shown an array of photos, not just Ameneiro's, and he also denied that his identification had been "coached" by the government.

> [THE GOVERNMENT] How many photographs did you see?
>
> [YOUMARAN] A few.
>
> [THE GOVERNMENT] A few?
>
> [YOUMARAN] Quite a few, yes.
>
> [THE GOVERNMENT] Not just a photograph of Mr. Ameneiro?
>
> . . . .
>
> [YOUMARAN] No.
>
> [THE GOVERNMENT] Now, let me ask you this, did I tell you what to say this morning?
>
> [YOUMARAN] No, sir.
>
> [THE GOVERNMENT] Did any agent of the United States government, FBI agent or U.S. Attorney's office ever tell you what to say?
>
> [YOUMARAN] No.
>
> [THE GOVERNMENT] What did I tell you you had to say today?
>
> [YOUMARAN] The truth.
>
> [THE GOVERNMENT] What did you understand will happen to you under your plea agreement if you don't tell the truth?
>
> [YOUMARAN] I will be facing the maximum sentence.

(Tr. at 830–31.) As the foregoing demonstrates, Youmaran made clear that the government instructed him to tell the truth during his testimony. Counsel for Ameneiro had ample opportunity during cross-examination to suggest that Youmaran's testimony was "coached," and he further had the opportunity, and took advantage of this opportunity, to present his arguments concerning "coaching" directly to the jury. He recited to the jury directly from his cross-examination of Youmaran, and suggested to them that the coaching of Youmaran "creates more than reasonable doubt." Thus, the issue of the veracity of Youmaran's identification was fully and vigorously argued before the jury, which was able to make its determination in light of these extensive arguments.

As stated, for a defendant to receive a new trial on the basis of allegedly perjured testimony, he must first show that the testimony was in fact false. *Saadeh,* 61 F.3d at 523; *see also United States v. Ferguson,* 35 F.3d 327, 332 (7th Cir.1994). Since Defendants have "failed to provide any evidence that [Youmaran] committed perjury, much less that the government knew or should have known" of any alleged perjury, *Saadeh,* 61 F.3d at 523, there is no basis for us to conclude that any prosecutorial misconduct occurred.

B. Alleged "coaching" and subornation of perjury by Ishu

▇ Ishu testified that, at Toma's direction, he met with Ameneiro early in 1994 for the purpose of retrieving cocaine Toma had previously fronted to Ameneiro. Ameneiro was returning the cocaine because, in his opinion, the cocaine was not of high quality. Initially Ishu testified that the date of the meeting between himself and Ameneiro was March 1994. When the government attorney, in an attempt to refresh Ishu's recollection, showed Ishu a transcript dated January 1994, from a phone call he placed to Ameneiro immediately prior to his meeting with Ameneiro, Ishu corrected himself and stated that the meeting occurred in January. Ishu also identified Ameneiro in open court.

During Ishu's cross-examination, Ameneiro's lawyer attempted to confuse Ishu into

thinking and testifying that the meeting between himself and Ameneiro had in fact occurred in March 1994. He also insinuated that the government had coached Ishu into thinking the meeting occurred in January 1994. Ameneiro's counsel further elicited self-contradictory statements from Ishu concerning how he disposed of the cocaine he obtained from Ameneiro at their January 1994 meeting. Ishu testified on direct examination that the cocaine he received from Ameneiro was eighteen grams short of the amount Toma had instructed him to obtain. On cross-examination, Ishu at first denied that he had taken the eighteen grams for himself, but later he admitted that he and some friends had snorted the eighteen grams of cocaine.

Defendants argue that, taken together, the alleged "coaching" of Ishu by the government concerning the date of his meeting with Ameneiro, along with Ishu's correction of his testimony regarding missing cocaine, amounted to subornation of perjury by Ishu.

 For a defendant to obtain a new trial on the basis of the government's use of perjured testimony, "the perjured testimony must be directly related to the defendant's guilt or innocence and must relate to material facts rather than collateral issues." *Ferguson*, 35 F.3d at 332. Further, " '[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.' " *United States v. Adcox*, 19 F.3d 290, 295 (7th Cir. 1994) (quoting *United States v. Griley*, 814 F.2d 967, 971 (4th Cir.1987)). The inconsistency in Ishu's testimony concerning the date of his meeting with Ameneiro, which he corrected upon having his memory refreshed through seeing the phone logs, is in our opinion simply too minor to have borne directly on the issue of Defendants' guilt. *Cf. Adcox*, 19 F.3d at 295 (" 'the complained of discrepancies went to immaterial and collateral issues' ") (quoting *United States v. Douglas*, 874 F.2d 1145, 1160 (7th Cir.1989)). The issues of whether Ishu properly recalled the date of his meeting with Ameneiro, and whether he took eighteen grams of the cocaine he received for himself may well have borne on his credibility as a witness, but falls

far short of rising to the level of perjury, much less demonstrating the government's knowing use of perjured testimony. Like Youmaran, Ishu testified that he had been told to tell the truth at all times.

[THE GOVERNMENT] Mr. Ishu, there were a lot of questions from [counsel for Ameneiro] about people telling you what to say, telling you what to do. *What was the one thing the government asked you to do today?*

[ISHU] To say the truth.

Further, like the defendant in *Saadeh*, the defense lawyers in this case "had an ample opportunity, of which [they] took advantage, to cross-examine [Ishu] during the trial, discredit him, and expose any alleged perjury." 61 F.3d at 523. During closing arguments, counsel for Ameneiro, as he had with Youmaran, argued that Ishu's testimony was false, and read extensive portions of the transcript of his cross-examination of Ishu in an attempt to buttress his point. Ishu, like Youmaran, testified that he had been instructed by the prosecutors to testify truthfully and was in fact testifying truthfully, and the jury had the opportunity to evaluate Ishu's credibility in light of the totality of the testimony as well as the arguments made by the defense lawyers concerning these allegations. Thus, since they had ample opportunity to expose any alleged perjury by Ishu, and they have not demonstrated on appeal that his testimony was false, we conclude that Defendants have failed to demonstrate grounds for reversal in Ishu's testimony.

C. Alleged subornation of perjury by witness Ress

 Ress testified that, prior to trial, she had reviewed a number of tapes and transcripts of conversations between and among the co-conspirators and authenticated that the transcripts accurately reflected the conversations at the time in question and corresponded with the voices on the tapes. She testified that she was familiar with the voices of all of Defendants (except for Aguilera and Iturralde). Several of the tapes included Ameneiro's voice.

While the jury was in deliberations, counsel for Ameneiro filed a motion for a mistrial. The motion, which was not accompanied by an affidavit from Ress and was based *solely* on the attorney's account of a meeting he allegedly had with Ress after all the evidence had been presented, claimed that Ress had told Ameneiro's counsel the following:

a. She advised [counsel for Ameneiro] that she had reviewed approximately 500 transcripts in preparation for her trial testimony.

b. She advised further that on a number of the transcripts she had signed her name at the bottom. *On 5 or 6 of those transcripts which reflected a conversation involving Robert Ameneiro she only signed her name as an authentication of the voice of the other participant. She did not intend to and advised the Assistant U.S. Attorney, Patrick Layng, that she was not authenticating that transcript as being a transcript of the voice of Robert Ameneiro.*

c. She further advised that any transcripts that were not signed by her were not authenticated by her as to any of the persons who are listed as speakers on the transcripts.

d. She further stated that she would be willing to testify to these matters in court because it was clear to her that she wished the truth to come out and that certain misrepresentations had been made regarding which transcripts she authenticated and which voices she authenticated on those transcripts.

(R. 596 (emphasis added).) The motion for mistrial thus characterized the presentation of Ress's testimony in which she stated that she had authenticated all of the tapes she listened to as "another example of inappropriate evidence or evidence that has been misrepresented to be something other than what it actually is[.]" Judge Hart declined to hold an evidentiary hearing on this matter and denied the motion, ruling that defense counsel had ample opportunity during trial to cross-examine Ress concerning her identification of the tapes and transcripts. Defendants argue that, based on Ress's alleged statements to Ameneiro's counsel that she did not intend to authenticate Ameneiro's voice on "5 or 6" of the transcripts, the failure of the prosecution to reveal this alleged information constituted "a further indication of prosecutorial misconduct." [12]

We note initially that, since the motion for mistrial was not accompanied by a sworn affidavit from Ress, and contained nothing more than Ameneiro's counsel's summary of what Ress allegedly told him, the district court was certainly entitled to view the allegations contained in the motion with skepticism. In *United States v. Kamel*, 965 F.2d 484 (7th Cir.1992), two co-defendants were convicted on charges arising from an arson at a store they co-owned. One defendant moved for a new trial on the basis that his co-defendant had allegedly "accepted full responsibility" for the fire and was prepared to exonerate him. 965 F.2d at 490. We held that the district court properly refused to grant a new trial, in part on the basis that "there is no affidavit in the record from [the co-defendant] of his confession[.]" 965 F.2d at 491. Similarly, in *United States v. Pointer*, 17 F.3d 1070 (7th Cir.1994), the defendant

---

**12.** We note that, while Defendants' brief has phrased their alleged entitlement to relief as coming from the "outrageous government conduct" doctrine, which has been rejected in this circuit, their brief quotes cases from district courts in this circuit discussing the prosecution's obligation to turn over exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). While Defendants' brief does no more than quote district court opinions and has not presented coherent argument on any alleged *Brady* violation, we note that irrespective of which argument they are seeking to make, our case law is clear that they need to show that any alleged improper conduct would have impacted the jury's verdict. "As with false testimony, suppression of evidence is not grounds for reversal unless there is a reasonable probability that, if the evidence had been disclosed, it would have changed the jury's verdict." U.S. v. *Rodriguez–Andrade*, 62 F.3d 948, 952 (7th Cir.1995) (citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215). As we observed recently in *United States v. Hamilton*, 107 F.3d 499 (7th Cir.1997), the prosecutor is not required "to divulge every possible shred of evidence that could conceivably benefit the defendant." 107 F.3d at 509 (citation omitted).

sought a new trial on the basis of a letter allegedly written to him from a witness who had testified at the grand jury proceedings against him which purported to recant that testimony. We noted that, since "[h]er letter was not a sworn affidavit," there was "grave doubt" about the credibility of the alleged recantation. 17 F.3d at 1074. Here, the failure to provide an affidavit from Ress specifying which portions (if any) of her trial testimony she allegedly claimed was false leaves us with similar "grave doubt" that there was any substance to the claims in the motion for mistrial.

Moreover, even assuming that the allegations contained in the motion are true, they do not demonstrate that Ress's trial testimony was false. Ress testified that she had authenticated roughly 500 tapes and transcripts, and the motion merely makes a vague reference to "5 or 6" tapes and transcripts which she was not authenticating. We have noted, *supra*, that some 200 of the tapes introduced in evidence went *unplayed* at trial, and Defendants have failed to point to anything in the record demonstrating or even suggesting that any of the "5 or 6" tapes were among those presented to the jury.[13] We have already noted that, to prevail on a claim that the government suborned perjury, the defendants must show that the government's case contained false testimony, that the government knew or should have known about it, and that there is a likelihood that the false testimony affected the judgment of the jury. *Saadeh*, 61 F.3d at 523.

Since Defendants have failed to show that Ress's testimony was false in the first place, or that the government knew it was false, they offer no basis for us to conclude that there was any subornation of perjury with respect to Ress's testimony.[14]

### D. Questioning concerning arson at a nightclub owned by Aguilera and Iturralde

█ Finally, Aguilera and Iturralde argue that they were prejudiced by a series of questions asked by the prosecution concerning an arson at Alamedas Casino, a Chicago nightclub they co-owned. On February 26, 1994, while Aguilera was in Mexico, the nightclub, which was insured for $2 million, was destroyed in a fire. Counsel for Aguilera, during opening argument, suggested that the government witness Tutuianu, who worked at the Alamedas Casino, was responsible for the fire. Tutuianu is the individual who introduced Agent Perez to Aguilera. Agent Perez was working undercover on the narcotics investigation by posing as a person interested in shipping cocaine. At trial, the government's lawyer questioned Perez about the conversations Perez had engaged in with Aguilera pertaining to the fire at the Alamedas Casino. During redirect, the following exchange transpired between the prosecutor and Agent Perez:

> [The Government]: [Counsel for Aguilera] talked to you about the financial problems of Mr. Aguilera....
>
> ....

---

**13.** While not specifically claiming that the tapes presented to the jury included any of the "5 or 6" allegedly not authenticated tapes, Defendants do point to a series of tapes which were played at trial and which counsel for Ameneiro asked the jurors to review because he believed that his client's voice had been misidentified. According to Defendants, "[s]uch a review of those tapes will leave anyone with the distinct understanding that several different voices have been identified by the Government as being the voice of Ameneiro." After reviewing the tapes, the jury apparently was not convinced that Ameneiro's voice had been misidentified because they convicted him of all counts with which he was charged. However, the efforts of Ameneiro's counsel demonstrates that the question as to the authenticity of Ress's identifications of Ameneiro's voice was presented to the jury by defense counsel, and that the jury had more than ample opportunity to

review, consider, and accept or reject those assertions. *See Saadeh*, 61 F.3d at 523–24.

**14.** We note finally that a charge of "subornation of perjury" should not be lightly made, especially where, as here, there is absolutely nothing in the record that would serve to establish that the government attorneys engaged in misconduct or "suborned perjury." It is one thing to argue that refreshing a witness's recollection or inconsistencies in testimony are factors for the jury to consider in assessing a witness's credibility. However, it is more serious to allege that government prosecutors engaged in subornation of perjury, as Defendants did here. The record in this case reflects nothing of the like, and the utter failure of Defendants to point to anything in the record to substantiate their charges against the government's lawyers in this case underscores the frivolous nature of those allegations.

[The Government]: Mr. Aguilera says to you ... "Because it's insured for $2 million"?

[Agent Perez]: Right.

[The Government]: What did you understand him to be talking about?

[Agent Perez]: He is talking about $2 million, that the club was insured for $2 million. That means if it would burn, I guess he would get something close to that.

[The Government]: That was money that he was going to receive?

[Agent Perez]: Right.

[The Government]: $2 million?

[Agent Perez]: At least he had insurance for that much.

[The Government]: What is the asking price of the casino when he mentioned that he wanted to sell it to you?

[Agent Perez]: 1.75, I think it is. $1,750,-000.

[The Government]: So there was about $300,000 plus difference between what he offered to sell the casino to you—

[Counsel for Aguilera]: Judge, objection to these questions. He is asking about the conversation.

[The Court]: Let him finish the question. What's the question?

[The Government]: There is about $300,-000 plus difference between what he offered to sell you the casino for and what he subsequently told you he was going to receive from the insurance proceeds?

[Counsel for Aguilera]: Objection.

[The Court]: Sustained.

(Tr. at 1652–53.) Aguilera and Iturralde now argue that they were prejudiced by this line of questioning, since it amounted to nothing more than an attempt to "get the jury to convict [Aguilera and Iturralde] for being criminals or simply bad people." Aguilera and Iturralde claim that the questions asked of Agent Perez planted the inference in the jury's minds that they deliberately had the Alamedas Casino burned down in order to collect insurance proceeds. The government responds that the questions asked of Perez were an "invited response" to the implication and inference previously created by defense counsel that government witness Tutuianu was responsible for the fire.

▮ "Under the 'invited response' doctrine, if defense counsel strikes the first blow, we will not necessarily reverse a conviction if the prosecutor attempts to even the scales by making a reasonable but otherwise improper response." *United States v. Johnson–Dix,* 54 F.3d 1295, 1305 (7th Cir.1995). "[T]he issue on appeal is 'whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.'" *Id.* (quoting *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985)).

Initially we note that, to the extent that the questioning at issue was improper at all, it was indeed an invited response to the insinuation by counsel for Aguilera that government witness Tutuianu was responsible for the fire. For example, at opening argument, Aguilera's counsel stated:

> [While Aguilera] is in Mexico ... [and] George Tut[u]ianu, the security chief's around [in Chicago], a fire happens at the Alamedas Casino ... I will ask you to consider how maybe that fire got started while [Aguilera] is in Mexico and Mr. Tut[u]ianu is here in Chicago.

(Tr. at 56.) Further, during his cross-examination of Agent Perez, counsel for Aguilera repeatedly asked Perez whether he knew who started the fire, further suggesting that Tutuianu, who was working with Perez, had committed the arson. Indeed, given that Aguilera's defense was based on the theory that he had been entrapped, certain of the defense lawyer's questions appear to go so far as to imply that Perez himself was involved in the fire:

> Q: [Aguilera] says, "Let's hope they don't take too long in fixing up all this." He is talking about the Alamedas Casino, isn't he?
>
> A: Right, sir.
>
> Q: Then ... he says, "But it's damaged now and I had a lot of events, a lot of good events"?
>
> A: Uh-huh.
>
> Q: Then you say, "Yeah." And he says, "So it affects me a lot"?

A: Right.

Q: He is talking—when he is talking about a lot of events he is talking about entertainment concerts and things that were going to be at the Alamedas Casino. That's your understanding, isn't it?

A: Right, sir.

. . . .

Q: Then ... he is saying that, "I'm looking for places right now so that I can organize some good dances."

. . .

A: ... But he also says ... "Of course. We're going to take a little time, but we can work there just fine." In other words, that was my concern, and he assured me that—

Q: It was your concern?

A: Well, if the building is burned down, I mean you got to figure that it's a setback.

Q: Well, you know it's a setback for Mr. Aguilera, don't you?

A: Right.

Q: *And you know there is going to be pressure on him, don't you?*

A: It's a setback for anybody.

Q: *You know that that's going to put on pressure for him to maybe try to make a cocaine deal or try to launder money, don't you?*

A: Right, sir.

Q: *You don't know who started that fire, right?*

A: I don't have no [sic] idea.

(Tr. at 1618–20 (emphasis added).)

Considered in light of the insinuations by counsel for Aguilera that Tutuianu, or possibly even Perez, may have started the fire at the Alamedas Casino in order to pressure Aguilera into becoming involved in drug trafficking, Defendants can hardly now claim prejudice from the government's attempt to rebut on redirect the inference created during the cross-examination of Perez by defense counsel just minutes earlier. During his conversation with Agent Perez, Aguilera admitted his past involvement in both money laundering and narcotics trafficking. Perez was on the stand for a full day, and he testified regarding numerous conversations he had with Aguilera concerning money laundering and drug trafficking. Taken in this context, we fail to see how the very brief questioning and invited response concerning the fire at the Alamedas Casino could have possibly caused prejudice to Aguilera or Iturralde.

Further, the jury was instructed both before and after trial to consider only the evidence presented and disregard "any evidence to which [the judge] sustained an objection or which [the judge] ordered stricken." Counsel for Aguilera's objection to the questions was sustained (though he never asked that the judge strike any of Perez's testimony). Aguilera and Iturralde offer no reason to question that this instruction would sufficiently alert jurors not to give any weight to the interrogatories asked of Agent Perez by the government's lawyers concerning the approximate $300,000 Aguilera stood to gain from insurance proceeds. Juries are presumed to follow the judge's instructions, and we simply fail to see how this question could have had any impact on their verdicts. *See United States v. Bell*, 980 F.2d 1095, 1098 (7th Cir.1992) (where objection to answer was sustained, and jury was instructed to consider only evidence presented, no prejudice to defendant occurred); *United States v. Olson*, 978 F.2d 1472, 1480–81 (7th Cir.1992) (objection to prosecutor's question sustained before answer did not prejudice defendant). We therefore disagree with Defendants contention that there is any basis for reversal on this issue.

*IV. Whether sufficient evidence supported the convictions of various Defendants*

 Several Defendants challenge the sufficiency of the evidence supporting their convictions. In *United States v. Johnson*, 26 F.3d 669 (7th Cir.1994), we reviewed the standard by which we judge claims that the evidence was insufficient to support a criminal conviction:

When considering a challenge to the sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson at 318, 99 S.Ct. at 2789–90.

26 F.3d at 684. Further, as we have noted *supra,* in *Vega,* we discussed how factfinders are permitted to conclude that recorded conversations pertain to narcotics transactions even though the dealers do not refer to the drugs by their common names. Bearing these principles in mind, we address the convictions of the various Defendants.[15]

## A. Rosa

Rosa argues that the evidence adduced at trial was insufficient to sustain his convictions for attempted possession with intent to distribute cocaine, possession with intent to distribute cocaine, and conspiracy to possess with intent to distribute cocaine.

### 1. Attempted Possession with Intent to Distribute Cocaine

■ Rosa contends that the evidence was insufficient to establish beyond a reasonable doubt that he attempted to possess with intent to distribute fifteen kilograms of cocaine from February 3 to February 5, 1994. He

argues that the government presented no evidence to demonstrate that he took steps toward obtaining possession of the cocaine.

■ To prove that a defendant attempted to possess cocaine with intent to distribute, the government must establish that the defendant acted with the specific intent to commit the underlying offense, and further that he took a substantial step toward its completion. *United States v. Cea,* 914 F.2d 881, 887 (7th Cir.1990). Rosa claims only that the government failed to prove that he took a substantial step toward obtaining the cocaine. He does not contest the intent element.

The recorded phone conversations that took place from February 3 to February 5, 1994, between Rosa, Toma and Valencia, establish that Rosa took a substantial step toward obtaining 15 kilograms of cocaine. On February 3, Rosa called Toma and told him that he wanted "15." Later that afternoon, Toma called Valencia and asked him for "15." On February 4, Rosa called Toma to check on whether he had gotten the "15." Toma then called Valencia and asked, "Did you get that for me?" Valencia responded, "Yeah, but not the kind you want." Valencia also told Toma that he would give him "3" to "try." Toma responded that Valencia should "[t]ry to get 15." Toma then called Rosa back and told him that he had "3 tickets." Later that evening, Toma told Valencia that he had shown "them" the "3" and that they wanted "12" more tomorrow.

On February 5, Valencia told Toma that if "you got the money ... they can give it to us." Toma told Valencia to bring "12" but Valencia responded that he could only get

---

**15.** Aguilera's brief seems to have attempted to present a general challenge to the sufficiency of the evidence supporting *all* of his convictions. The only argument actually developed in the brief's argument section, however, is a claim that the evidence showed that he was entrapped with respect to one count of the indictment—count 63. It is interesting to note that Aguilera does not argue in his opening brief that the trial court erred in not giving his proposed entrapment instruction, though he does argue in his *reply* brief that the court erred in not giving that instruction. Arguments not raised in an opening brief are waived; thus we will not address whether the trial court should have given an entrapment instruction, since "it is improper to present new

arguments in a reply brief." *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1253 n. 2 (7th Cir.1989); *see United States v. Berkowitz,* 927 F.2d 1376, 1391 (7th Cir.1991) (citing Fed. R.App. P. 28; Seventh Circuit Rule 28(f)).

The argument made in Aguilera's initial brief that the evidence was insufficient to support his conviction is meritless, as it amounts to a simple request that we accept his self-serving view of the evidence that he was entrapped. "An appellate court will not weigh the evidence or assess the credibility of witnesses." *Vega,* 860 F.2d at 794 (quoting *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986)). Thus, we will not devote any discussion in this opinion to Aguilera's sufficiency claim.

"8." Valencia and Toma agreed to meet in Toma's garage. However, Rosa called Toma before the meeting and told him that he had gotten a lower price, so the deal was "on hold." On February 6, Toma and Youmaran went to Rosa's house in Toma's load car. Toma explained to Youmaran that the purpose of the trip was to provide Rosa with "another one," because Rosa had "sold those three I [Toma] gave him." (Tr. 740.) Youmaran testified that he accompanied Toma to Rosa's house, where Toma delivered another kilo of cocaine to Rosa.

Viewing the evidence of the phone conversations and the visit by Toma and Youmaran to Rosa's house on February 6 in the light most favorable to the government, a reasonable and properly instructed jury could conclude that Rosa took a substantial step toward acquiring the fifteen kilograms of cocaine.[16] Rosa called Toma and ordered fifteen kilos of cocaine. While Toma was not able to deliver all of the cocaine, Toma and Rosa did more than merely agree on the delivery of fifteen kilos of cocaine; Toma delivered a portion of the fifteen kilos and was in the process of attempting to find twelve more, but Rosa put the deal on hold. This distinguishes the present case from *Cea*, the case on which Rosa relies. In *Cea*, the sole evidence of a substantial step consisted of the defendant leaving his home following a phone call in which he had agreed to pick up drugs, which the government argued meant that he was "very likely" in the process of picking up the drugs he had discussed on the phone. 914 F.2d at 888. In rejecting this argument, we stated that while the government "does not have to wait until the transaction is complete ... it needs more evidence than what it produced at trial." *Id.* Here, by contrast, the tape of Toma's conversation with Youmaran, and Youmaran's testimony, which explained that Toma had delivered three of the fifteen kilos sought by Rosa and was in the process of negotiating for the delivery of the other twelve, illustrate that the attempted possession by Rosa of fifteen kilograms of cocaine had gone far beyond the attempt in *Cea*;

indeed, Rosa had already acquired part of what he sought. In *United States v. Wilks*, 46 F.3d 640, 645 (7th Cir.1995), we stated "[w]hether [the defendant] took a substantial step toward completing that transaction was a question of fact for the jury to decide. It found that he did, and we agree." As in *Wilks*, we conclude that the evidence was sufficient to establish a substantial step by Rosa toward the possession of fifteen kilos of cocaine.

2. Possession with Intent to Distribute Cocaine

▮ Rosa next claims that the government's evidence was insufficient to establish beyond a reasonable doubt that he possessed with intent to distribute ten kilograms of cocaine on February 3, 1994. He argues that the government failed to prove that he possessed the drugs because there was no eyewitness testimony, no videotape evidence, and no other physical evidence supporting the charges. Rosa further contends that the only evidence presented by the government, consisting of taped phone conversations between himself and Toma, was thus insufficient as a matter of law to establish that he possessed cocaine.

▮ To establish that a defendant possessed cocaine with the intent to distribute, the prosecution must prove that the defendant: (1) knowingly or intentionally possessed cocaine; (2) possessed cocaine with the intent to distribute it; and (3) knew the cocaine was a controlled substance. *United States v. Jackson*, 51 F.3d 646, 655 (7th Cir.1995). Rosa's contention is that he never possessed the cocaine. He does not challenge the intent to distribute or the knowledge requirements.

▮ "[I]n order to demonstrate possession of cocaine, it is sufficient that the government show a level of control that meets the standards of 'constructive possession.'" *United States v. Martinez*, 937 F.2d 299, 305 (7th Cir.1991); *see also Jackson*, 51 F.3d at 653. To establish constructive pos-

---

16. Rosa fails to allege that the jury was not properly charged with respect to any of his convictions.

session, the government must set forth evidence demonstrating ownership, dominion, or control over the contraband. *United States v. Johnson,* 26 F.3d 669, 685 (7th Cir.1994); *see United States v. Lloyd,* 71 F.3d 1256, 1266–67 (7th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996). Although mere association with another who possesses drugs is insufficient to sustain a possession conviction, " 'a person can be convicted for possessing cocaine [even] though he does not possess it in a literal sense.' " *Johnson,* 26 F.3d at 684–85 (quoting *United States v. Moya–Gomez,* 860 F.2d 706, 756 (7th Cir.1988)); *see Jackson,* 51 F.3d at 653.

Viewing the evidence in the light most favorable to the prosecution, the taped conversations between Toma and Rosa reflect that on February 3, 1994, Rosa told Toma that Rosa had given "this guy" the "10,000" grams and that he wanted "10" more kilograms. Toma responded that he would get back to Rosa in a few hours to let him know if he could "do it" and told Rosa that he would have to pay "$20.50," which meant $20,500 per kilo. As detailed *supra* part 1, Toma engaged in conversations with Valencia in an attempt to supply the fifteen kilos, but the deal was put "on hold" by Rosa when he found another supplier who could deliver the cocaine "at $20," or $20,000 per kilo. A rational jury may very well have chosen to believe Rosa's assertions set forth in his phone call to Toma on February 3 that he had delivered ten kilograms of cocaine and, by implication, that Rosa possessed those ten kilograms. That taped telephone conversation also demonstrated that Rosa had ownership, dominion, or control over the cocaine because Rosa himself stated that he gave the cocaine to another person and had knowledge and conveyed that knowledge to Toma that he wanted ten more.

### 3. Conspiracy to Possess with Intent to Distribute Cocaine

■■■ Finally, Rosa argues that the evidence was insufficient to establish beyond a reasonable doubt that he was a member of a conspiracy to possess with intent to distribute cocaine. He contends that, while the evidence may be sufficient to show that Rosa

purchased cocaine from Toma, nothing shows that Rosa ever agreed to join a conspiracy.

We recently reiterated what burden the government bears and how we review the evidence when considering a defendant's participation in a conspiracy in *United States v. Edwards,* 77 F.3d 968 (7th Cir.), *vacated and remanded for resentencing on other grounds,* — U.S. ——, 116 S.Ct. 2543, 135 L.Ed.2d 1064 (1996):

> To prove that a defendant was a member of a conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant. To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose. When reviewing conspiracy convictions, we must be certain that the Government presented substantial evidence that the defendant was a conspirator. The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.

77 F.3d at 974 (citing *United States v. Pulido,* 69 F.3d 192, 206 (7th Cir.1995)). In *United States v. James,* 40 F.3d 850 (7th Cir.1994), *vacated and remanded on other grounds,* — U.S. ——, 116 S.Ct. 664, 133 L.Ed.2d 515 (1995), we noted that whether "the defendant's acts rendered support to the coconspirators, whether the defendant was entrusted with some task that furthered the criminal design, or whether he entered into a mutually cooperative relationship with coconspirators that assisted them in bringing about the object of the conspiracy" were all relevant to determine whether a defendant participated in the conspiracy. 40 F.3d at 866.

In the light most favorable to the prosecution, the evidence demonstrates a continuing and intertwined relationship, lasting several months, between Rosa and the other coconspirators, particularly Toma. Rosa performed a number of tasks to aid in the efficient operation of the distribution network. For example, Rosa allowed Toma to use his house as a place to "break up" co-

caine into smaller packages, he supplied Toma with cocaine when Toma's usual suppliers ran low, and he purchased cocaine from Toma to distribute to his own clients. Toma frequently fronted cocaine to Rosa, and Rosa answered Toma's telephone calls, took messages for Toma from those callers, and communicated with Toma's other customers from time to time. On February 6, Toma and Youmaran went to Rosa's house, where the three men counted out $60,000 in proceeds from narcotics sales. As these acts demonstrate, Rosa was a trusted member of, and participant in, Toma's cocaine operation, thus showing his agreement to participate in the conspiracy.

### B. Rabon

■ Rabon also argues that the evidence was insufficient to sustain his conviction on Count 65 for possession of cocaine. In the light most favorable to the conviction, the evidence showed that, from the period of May 9 through the late afternoon of May 12, Rabon's girlfriend, Ivette Colon, had given him the keys to her apartment, as she was hospitalized during that time. Rabon was the sole occupant and had sole control and possession of Colon's apartment from May 9 through May 12. Colon testified that the cocaine was not hers, that she did not notice the cocaine when she returned in the late afternoon of May 12, and that the cocaine the agents found at her apartment was "probably" Rabon's. Colon also identified a gym bag in which the cocaine was found as belonging to Rabon. When the authorities arrived on the morning of May 13, Rabon attempted to flee Colon's apartment through a back window in his underwear. In our opinion, this evidence, considered in the light most favorable to the conviction, supports the conclusion that Rabon had constructive possession of the cocaine found in three gym bags. In a case where the facts were somewhat similar, we found evidence that a defendant had keys to an apartment and was one of two individuals who had rented the apartment sufficient to sustain the possession conviction. *See Jackson*, 51 F.3d at 655. Indeed, the facts presented here support the conviction even more strongly than in *Jackson*, since Rabon had sole control of Colon's

apartment from May 9 through May 12. From the evidence presented, we conclude that a jury could have found that Rabon was in constructive possession of the cocaine found in the gym bags at Colon's apartment on May 13.

### C. Pinto

■ Pinto claims that there was insufficient evidence presented at trial to support his conviction for attempted possession with intent to distribute 100 kilos of cocaine based on his participation in the "reverse buy" transaction detailed *supra*. He argues that the government's case was based solely on circumstantial evidence and that "[t]he limited evidence presented against Pinto requires too many inferences and assumptions to support his conviction beyond a reasonable doubt."

In *United States v. Briscoe*, 896 F.2d 1476 (7th Cir.1990), we had occasion to review the use of circumstantial evidence in support of a conviction:

> By its very nature, a conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the *sole support* for a conviction. Although the jury's verdict may not rest solely on the piling of inference upon inference ..., the view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt. Indeed, juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict.... While common sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.

896 F.2d at 1505–06 (citations and internal quotation marks omitted; emphasis in original).

In this case, the government presented evidence of recorded phone conversations between Pinto and Aguilera in which they em-

ployed "drug code" in describing narcotics transactions. For example, during the five-day period in May 1994 when Aguilera was negotiating with Perez concerning the "reverse buy" transaction (discussed *supra* part II), Aguilera was also engaging in repeated phone calls with Pinto in which they described the transaction in terms of drug code. On May 6, immediately after informing Perez that he needed "100 women," Aguilera called Pinto and they arranged to meet and did meet. Three days later, Aguilera called Perez and told him that they could come up with "half" of the money Perez was seeking up front for the cocaine. On May 10, Aguilera told Pinto that he thought they had a "concert" ready. On May 11, Aguilera spoke with Perez, who told him that "those 100 ladies" were on their way, and Aguilera immediately thereafter spoke with Pinto and arranged to meet at a park. After this meeting, Aguilera told Tutuianu that he had just returned from a meeting with his "partner." Following phone calls to Toma to arrange for the use of his car in delivering the drugs, a meeting date for delivery was set. Ultimately, Defendants were all arrested prior to that meeting.

■ Testifying in his own defense, Pinto admitted that he was familiar with the drug code language, and even admitted that he engaged in conversations using the code, however, he alleged that he was merely "stringing along" Aguilera in order to entice him to promote musical concerts with Pinto. The jury was obviously not impressed with Pinto's assertions, and neither was the trial judge, who enhanced Pinto's sentence based on his conclusion that Pinto's testimony was "simply false." Pinto has alternatively claimed that, while the conversations might have been probative of his participation in a money laundering scheme organized by Aguilera, they do not establish his participation in the "reverse buy." This argument in effect asks us to substitute Pinto's view of the evidence for the jury's. As we stated in *Vega*: "Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words." 860 F.2d at 795 (quoting *United States v. Zanin*, 831 F.2d 740, 744 (7th Cir.1987)). " 'Judges in the federal sys-

tem, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world[.]' " *United States v. Garcia*, 35 F.3d 1125, 1129 (7th Cir.1994) (quoting *United States v. Tolson*, 988 F.2d 1494, 1504 (7th Cir.1993)). Further, "the jury could certainly infer from the telephone toll records, the taped conversations and the testimony at trial" that Pinto and Aguilera were "in regular contact ... during the course of the transaction." *Id.* Considered in light of the totality of the evidence, including Pinto's conviction (which he does not challenge) on the overall conspiracy count and another count of attempted distribution of cocaine, we are of the opinion that the government presented sufficient evidence of Pinto's involvement in the "reverse buy" transaction to sustain his conviction.

*V. Whether the district court's enhancement of Toma's sentence under § 3B1.1(a) of the Sentencing Guidelines was proper*

■ Prior to his sentencing, Toma filed objections to the guideline calculations and recommendation contained in the pre-sentence investigation report (PSR). Among his objections was a challenge to the recommendation that he receive a four-level enhancement for being a "leader or organizer" under § 3B1.1(a). The sentencing judge overruled Toma's objection and found that he qualified for the enhancement. On appeal, Toma argues that the district judge committed clear error in finding him eligible for the enhancement. We disagree.

Section 3B1.1(a) of the guidelines, which provides for an enhancement when a defendant has been a "leader or organizer" of criminal activity, reads as follows: "(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a) (1994). Application note 2 elaborates on the requirements, indicating that: "To qualify for an adjustment under this section, *the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants*" (emphasis added). Toma ar-

gues that the evidence was insufficient to establish that he organized or led any other participants in the conspiracy to support the enhancement. The district court, however, rejected Toma's argument at the time of sentencing, stating: "I have to disagree with you ... I listened to the evidence here for several weeks. And clearly Mr. Toma was the leader, organizer, manager, director, the person who was central in every way in these transactions. I, therefore, overrule your objection to the [sentence enhancement under § 3B1.1(a) ]." We review the district court's determination concerning the applicability of § 3B1.1(a) for clear error. *United States v. Goines*, 988 F.2d 750, 777 (7th Cir.1993). Based on his assertion that the above finding is inadequate to support the enhancement, Toma argues that our review of the claim at issue should be *de novo*. We need not dwell on this, however, because in any event, after reviewing the record we may affirm based on grounds other than those stated by the sentencing judge. *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir.1994) (citing *United States v. Carson*, 9 F.3d 576, 585 (7th Cir.1993)). As we will discuss, there was ample evidence in the record from which the district judge could conclude that Toma qualified for a sentence enhancement under § 3B1.1(a).

In *United States v. Hall*, 109 F.3d 1227 (7th Cir.1997), we recently addressed a claim similar to Toma's, in which the defendant argued that there was insufficient evidence produced to establish that he had exercised control over participants. In addressing this argument, we reiterated this circuit's standard under which a § 3B1.1(a) enhancement is warranted:

> To receive a four-level enhancement under § 3B1.1(a), the defendant must be "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." This circuit has held that to merit a four-point enhancement for one's leadership role under § 3B1.1(a) when the criminal activity involved five or more participants, the defendant must have had control, direct or indirect, over at least four other participants in the offense. *When we use the word "control," however, we use it in a broad sense to mean some*

*kind of supervisory or organizational role with respect to those participants, including recruitment of other participants.*

109 F.3d at 1234–35 (emphasis supplied) (citations omitted).

Toma's argument is premised upon *Mustread* and *United States v. Brown*, 944 F.2d 1377 (7th Cir.1991), two cases from this court in which we concluded that there was insufficient evidence that the defendant was a "leader or organizer" because there was insufficient evidence that the defendant controlled the activities of others. In *Mustread*, we vacated the defendant's sentence enhancement under § 3B1.1 where the trial judge had listed as reasons for the enhancement that the defendant " 'was at the top of a drug distribution network,' " and " 'exercised total control over his [the defendant's] marijuana purchases.' " 42 F.3d at 1103. We concluded that, since these findings and our review of the record failed to demonstrate that the defendant "had influence or authority over anybody to whom he distributed," the trial court's findings did not support the enhancement. *Id.* at 1104–05. Similarly, in *Brown*, we vacated a § 3B1.1 enhancement where the trial court had "focused on evidence that [defendant] was a distributor" in a larger narcotics operation. 944 F.2d at 1381. While we observed that "[m]iddlemen are not, of course, immune from application of § 3B1.1," *id.* (citation omitted), we concluded that "middleman status alone cannot support [an enhancement under § 3B1.1]," *id.* at 1382.

Toma claims that the evidence presented at trial did not establish that he supervised other individuals, but that his situation was akin to the status of a middleman or distributor. Toma's argument conveniently overlooks the evidence concerning the roles, activities, and relationship to Toma of Ress, Ishu, Youmaran and others involved in the conspiracy. Ress testified that she accompanied Toma on virtually a daily basis to pick up money from drug sales and deliver narcotics, and further that she frequently answered the phone for Toma when his drug suppliers or purchasers called and forwarded the information to Toma. Youmaran testified

that he also frequently accompanied Toma in his "load" cars to deliver cocaine and pick up money from sales of narcotics. Specifically, he testified as follows:

> [THE GOVERNMENT]: When did you first become involved in drug dealing with Mr. Toma?
>
> [YOUMARAN]: Towards the end of '93.
>
> [THE GOVERNMENT]: Can you describe what it was that [you did] for Mr. Toma during the time that you were dealing drugs?
>
> [YOUMARAN]: We delivered cocaine.
>
> [THE GOVERNMENT]: Did you do anything else?
>
> [YOUMARAN]: Drove the car, counted money.
>
> [THE GOVERNMENT]: When you say 'drove the car,' what car are you talking about?
>
> [YOUMARAN]: The car that had hidden compartments in it.
>
> [THE GOVERNMENT]: And you indicated there was money in the car when you drove it?
>
> [YOUMARAN]: Yes.
>
> [THE GOVERNMENT]: Did you do anything else?
>
> [YOUMARAN]: Counted the money.
>
> [THE GOVERNMENT]: You counted the money with who?
>
> [YOUMARAN]: With Toma.
>
> [THE GOVERNMENT]: Did you ever answer the telephone for Mr. Toma?
>
> [YOUMARAN]: Yes, I did.
>
> [THE GOVERNMENT]: Who did you answer the telephone—who was on the other end of the line when you answered the telephone?
>
> [YOUMARAN]: People that he dealt with. And I just gave [ ] the messages to him.
>
> [THE GOVERNMENT]: What type of messages, sir?
>
> [YOUMARAN]: That they wanted to talk to him, they're ready.
>
> [THE GOVERNMENT]: Drug messages?

> [YOUMARAN]: Yes.

(Tr. at 731–32.) Youmaran also testified about a particular occasion when, at Toma's request, he accompanied Toma to Rosa's house, where he (Youmaran) helped Toma count $60,000 in proceeds from narcotics sales. Finally, as noted *supra*, Ishu also testified that, at Toma's direction, he obtained cocaine from Ameneiro that had been previously "fronted" to him by Toma. He also testified that he did errands for Toma, answered the phone for Toma and delivered messages to him, and fixed his car on occasion.

 Further, the PSR recounted that Toma directed and/or supervised the activities of other participants, including individuals who were named in the indictment.[17] While Toma objected at sentencing to the PSR's recommendation that he qualified for the § 3B1.1(a) enhancement, he offered no evidence in contradiction of its findings. As we observed in *Mustread*:

> A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a "bare denial," he must produce some evidence that "calls the reliability or correctness of the alleged facts into question." If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

42 F.3d at 1101–02 (citations omitted). Our examination of Toma's sentencing memorandum and the transcript of his hearing reveals that he at no point produced evidence or made an argument with respect to the PSR's findings about his control and supervision over other participants in the conspiracy beyond simply disputing the conclusion in the PSR that he qualified as an "organizer or leader." We note finally that, as in *Hall*, the trial judge "heard all the testimony and other evidence at trial," 109 F.3d at 1234, and thus was able to evaluate the arguments made by defense counsel at sentencing in light of that

---

**17.** Other participants named in the indictment included the aforementioned Youkhanna and King, as well as Martin Enwia.

evidence. Given the testimony and the findings of the PSR, we think the § 3B1.1(a) sentence enhancement was properly imposed in Toma's case. As we noted in *Mustread*, those over whom the "leader or organizer" exercises control need not "have played marionette to the defendant's puppeteer. For these purposes, to control another the defendant *may simply have organized or in some way directed him.*" 42 F.3d at 1104 (emphasis supplied). Upon review of the record, we are convinced that Toma exercised sufficient control, direction and supervision over the activities of the other participants to qualify for the enhancement as a "leader or organizer" pursuant to § 3B1.1(a).

*VI. Whether the trial court's attribution of certain drug quantities to Toma for sentencing purposes was proper*

■ Toma next argues that the trial court erred in attributing various quantities of cocaine to him for sentencing purposes. Specifically, he challenges the attribution of twenty kilos to him, instead of three, for counts 59–61; the attribution of twenty, instead of ten, kilos for count 62; and the attribution of 100, as opposed to fifteen, for counts 63–64. The sentencing judge determines the amount of narcotics to attribute for sentencing purposes by a preponderance of the evidence. *United States v. Pitz*, 2 F.3d 723, 726 (7th Cir.1993). " 'The district court is to base its determinations upon the evidence in the record and upon its own credibility evaluations. These credibility evaluations will be given the utmost deference.' " *United States v. Taylor*, 72 F.3d 533, 542 (7th Cir.1995) (quoting *United States v. Mumford*, 25 F.3d 461, 465 (7th Cir.1994)). As we stated in *Pitz*, "[w]e defer to the sentencing judge's credibility determinations because the presiding judge while listening to the witnesses' testimony is in the best position to observe, weigh, and evaluate a witness' verbal as well as nonverbal behavior." 2 F.3d at 727 (citation omitted). We review the trial judge's attribution of drug quantities to a defendant for sentencing purposes for clear error. *United States v. Buggs*, 904 F.2d 1070, 1078 (7th Cir.1990). Reversal is warranted only when we are left with the definite and firm conviction that a

mistake has been made. *United States v. Edwards*, 115 F.3d 1322, 1325 (7th Cir.1997). Because we conclude that Toma's arguments are insufficient and fall far short of demonstrating clear error on the part of Judge Hart, we need only consider them in summary fashion.

■ Toma claims that, since Ishu testified that he only saw Toma in possession of three kilos during the transaction giving rise to counts 59–61, Toma should only have been attributed that amount for sentencing. He acknowledges, however, that in a recorded phone call to Matthews, he stated that he had received twenty kilos during that transaction. In effect, the question of how to resolve the conflicting evidence was one for the trial judge, and we will not reverse under the clear error standard. *See Pitz*, 2 F.3d at 727.

■ Toma next argues that he should be held accountable for ten kilos, as opposed to twenty, for count 62. He claims that, since Magana alone was charged in count 62, and the evidence showed that only ten of the twenty kilos Magana was carrying were to be delivered to Toma, he should be held accountable for no more than the ten kilos he expected to receive. However, the law is clear that Toma was not only responsible for the amount of narcotics he personally distributed, but also for all amounts involved in the conspiracy reasonably foreseeable to him. *Goines*, 988 F.2d at 775. *See also Pitz*, 2 F.3d at 727 ("Each conspirator is responsible for the amount of cocaine he actually distributed as well as the amount involved reasonably foreseeable to him."). "[R]easonable foreseeability 'means more than subjective awareness' that a drug distribution network exists; instead, the individual defendant may be held responsible for the conduct of coconspirators 'if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct.' " *United States v. James*, 40 F.3d 850, 870 (7th Cir.1994) (quoting *United States v. Edwards*, 945 F.2d 1387, 1393–94 (7th Cir.1991)). Though we have held in some cases that a minor participant or late entrant into the conspiracy could not be held accountable for large sums of narcot-

ics delivered because he could not be said to have agreed to be involved with such deliveries, these cases have tended to focus on the late entrance of the defendant into the conspiracy and the attribution of narcotics delivered prior to the defendant's entry, or on the limited nature of the defendant's participation in the conspiracy. *See, e.g., United States v. Wagner*, 996 F.2d 906, 915 (7th Cir.1993); *United States v. Mojica*, 984 F.2d 1426, 1445–46 (7th Cir.1993). By contrast, Toma (as discussed *supra*) was the central figure in and ringleader of this conspiracy which distributed over 150 kilograms of cocaine, and was central to the operations from beginning to end. Thus, even assuming that Toma was not *actually* aware that Valencia had other quantities in his possession not intended for Toma at the time he was preparing to deliver the ten kilos to Toma, given the significant nature and scope of the supply relationship between the two,[18] and the central role played by Toma in the conspiracy, it was certainly reasonably foreseeable to Toma that Valencia would supply him with more than the ten kilos he was preparing to receive at that time. Thus, we are of the opinion that the trial judge did not commit clear error in determining that the full twenty kilos was "reasonably foreseeable" to Toma, and attributing that amount to him for sentencing purposes.

■ Finally, with respect to counts 63–64, pertaining to the "reverse buy" discussed *supra*, Toma argues that he should not be held accountable for the full 100 kilograms that was discussed as the amount to be purchased. Toma acknowledges that he allowed Aguilera to use his "load" car knowing that it would be used to transport the cocaine; thus he directly aided and abetted that transaction. *See United States v. Corral–Ibarra*, 25 F.3d 430, 438 (7th Cir.1994). Thus, since he aided and abetted the transaction in which the 100 kilograms was to be purchased and transported, he may be held responsible for the entire amount of cocaine in that transaction whether he was aware of the exact amount or not. *Id.* We conclude that there

was no error in the attribution of 100 kilos to Toma from counts 63–64.

### VII. Whether the trial court properly declined to grant additional peremptory challenges to Defendants

Defendants next argue that the trial court erred in refusing to grant them additional peremptory challenges. We disagree.

■ A criminal defendant in a felony case where the crime is not punishable by death is entitled to ten peremptory challenges under Fed.R.Crim.P. 24(b). Where multiple defendants are being jointly tried, the rule provides that "the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." However, even where a number of defendants are being jointly tried, a trial court is not obligated to provide them with additional challenges. "The decision whether to grant additional peremptory challenges in multi-defendant trials, therefore, lies within the sound discretion of the district court." *United States v. Cochran*, 955 F.2d 1116, 1121 (7th Cir.1992). While it may be difficult for multiple criminal defense lawyers to agree on how to exercise peremptory challenges, this disagreement does not compel a trial judge to grant the defendants any additional peremptory challenges. *E.g., United States v. Farmer*, 924 F.2d 647, 653 (7th Cir.1991) (no abuse of discretion in refusing to grant additional peremptory challenges where counsel for six defendants could not agree on use of the challenges).

■ Despite the fact that they were in fact given two additional peremptory challenges by Judge Hart (for a total of twelve), Defendants argue on appeal that they should have been allotted even more challenges. Defendants argue that they were prejudiced in this case by the trial court's refusal to grant more additional peremptories because, after a juror was excused late in the trial for failure to appear on time, the alternate who replaced the juror was an attorney who was at the time of trial practicing at the same firm with a former Assistant United States

---

**18.** In this regard, we observe, as did the district court, that Toma obtained counsel for Valencia

with respect to the incident giving rise to count 62.

Attorney. Defendants fail, however, to point us to anything which suggests that the presence of the attorney on the panel caused them any prejudice, particularly since the trial judge questioned the attorney thoroughly about the potential effect:

> THE COURT: If you were selected for this jury, would you agree to serve as another juror and not just as a lawyer in the jury room?
>
> PROSPECTIVE JUROR [ ]: Yes. THE COURT: Would you follow my instructions on the law?
>
> PROSPECTIVE JUROR [ ]: Yes.
>
> THE COURT: And would you refrain from giving your own instructions on the law?
>
> PROSPECTIVE JUROR [ ]: Yes.
>
> THE COURT: Thank you[.]

(Supp. Tr. at 173.) In our opinion, Defendants' unsubstantiated assertions that they were prejudiced either by the absence of additional peremptories or by the presence of this attorney on the panel do not support the conclusion that the trial judge abused his discretion in refusing their request for additional peremptories.

*VIII. Whether the district judge's ruling admitting tape recordings based on the identification of the voices of Aguilera and Iturralde was proper*

█ Like the other Defendants, a significant portion of the government's case against Aguilera and Iturralde was based upon tapes of various phone conversations in which they arranged for and discussed narcotics transactions. To establish a foundation for the identification of Aguilera and Iturralde's voices, the government relied on the identification testimony of Agent Guerra, who was part of the team investigating the Toma drug ring. Agent Guerra testified that he became familiar with the voices of Aguilera and Iturralde during the course of the investigation. Through the assistance of Tutuianu, a former narcotics dealer working for the government in exchange for money, Guerra met with Aguilera and Iturralde at a bar, where they discussed the "reverse buy" transaction. The four men conversed at the bar, and later at a restaurant, for approximately two hours. During that time they conversed in Spanish, and all of the men consumed approximately three or four beers apiece at the bar, while Aguilera and Iturralde consumed more alcohol at the restaurant. This occurred approximately nine months prior to trial, and was the only occasion at which Guerra spoke with Aguilera and Iturralde in person. On appeal, Defendants contend that, since all of the parties were drinking on the only occasion when Guerra spoke to Aguilera and Iturralde, and since the conversation at that time was in Spanish, while the tapes authenticated were in English, Guerra's testimony failed to establish a sufficient foundation for the admission of the tapes of Aguilera and Iturralde.

In *Vega*, we reviewed the prerequisites for the admission of recorded conversations and voice identification testimony:

> " 'Tape recordings are only admissible if the government can establish by clear and convincing evidence that the recordings are "true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved." *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)).' "
>
> ... "As we stated in *United States v. Faurote*, '[t]he trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent "extraordinary circumstances." ' 749 F.2d at 43. Moreover, because '[t]he trial judge [is] in the best position to weigh the credibility of the parties and the evidence presented,' *id.* at 44, 'the trial judge exercises broad discretion in determining whether [the government's] burden has been satisfied.' *Id.* at 43."

860 F.2d at 788 (quoting *United States v. Zambrana*, 841 F.2d 1320, 1338–39 (7th Cir. 1988)). We have in the past observed that the reason we defer to the trial court's rulings concerning witness testimony is because the trial judge:

> "has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice,

eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *United States v. Eddy,* 8 F.3d 577, 582–83 (7th Cir.1993) (quoting *Tolson,* 988 F.2d at 1498) (internal quotation marks omitted).

Aguilera and Iturralde's argument is premised upon the fact that Guerra met with them on but one occasion where they consumed a number of drinks, which Guerra admitted can cause changes in a person's voice, and furthermore that the conversation was in Spanish, while the tapes Guerra identified were in English. It is undisputed that Guerra is fluent in both English and Spanish. In *Vega,* we upheld the admissibility of voice identification where the identifying agent had a similar opportunity to become familiar with the voices of the suspects he identified on tape.[19] In that case we stated, and it is also true here, that the arguments made by appellants simply go to the "weight the jury accords this evidence, not to its admissibility." 860 F.2d at 788. As to Defendants' assertion that "[t]he simple fact is that Guerra lied" when he testified that he was familiar with Aguilera and Iturralde's voices, we observe that there is no substantiation in the record for that assertion. In any event, such a claim amounts to a challenge to Guerra's credibility. Defense counsel had ample opportunity to challenge Guerra's testimony and credibility on cross-examination, the jury had the opportunity to observe Guerra's testimony and demeanor on the stand, and as a reviewing court, " '[i]t is, of course, not our function in this setting to judge the ultimate accuracy of the identification; that decision [is] made by the jury in its role as finder of the facts.' " *Vega,* 860 F.2d at 790 (quoting *United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1156 (7th Cir.1987)).

*IX. Whether the trial judge erred in declining to give Ameneiro's proposed instruction concerning the reliability of voice identification* [20]

■ At trial, Ameneiro submitted an instruction pertaining to the reliability of voice identification testimony. Ameneiro argues that the district court erred in not giving his proposed instruction, which stated, in pertinent part, that the "value [of the voice identification] depends upon the opportunity the witness had to hear the offender at the time of the offense and later make a reliable identification[.]" We disagree.

■ In *Vega,* we addressed the prerequisites for the admissibility of voice identification testimony under the Federal Rules of Evidence:

Federal Rule of Evidence 901(b)(5) ... permits voice identification of tape recordings to be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." As long as the basic requirement of familiarity with the voice is met, lay opinion testimony is an acceptable means for establishing a speaker's identity.

860 F.2d at 788 (citation omitted).

■ A defendant is entitled to an instruction on a defense theory if: (1) the proposed instruction correctly states the law; (2) the theory advanced by the instruction is supported by the evidence; (3) the theory advanced is not part of the charge presented to the jury; and (4) the failure to include the instruction on the defendant's theory would deny the defendant a fair trial. *United States v. Church,* 970 F.2d 401, 408 (7th Cir.1992). On appeal, we consider whether the district court erred in denying the proposed instruction after reviewing the instruc-

---

19. In *Vega,* we held that it was not an abuse of discretion to permit voice identification of a defendant by an officer who had spoken with the defendant once before, two years before trial, for approximately two hours. The tapes in that case were in Spanish, and the officer, who did not speak Spanish, had spoken with the defendant in English.

20. Ameneiro's individual brief raises three issues. However, closer examination reveals that

two of those issues—relating to alleged prosecutorial misconduct and Ameneiro's request for a severance-are virtually verbatim copies of the sections of the consolidated brief addressing those issues on pages 34–49. Thus, our discussion of those issues as they pertain to all Defendants adequately disposes of Ameneiro's claim, and we will confine the discussion here to the one unique issue raised by Ameneiro in his brief.

tio-us as a whole, giving deference to the trial judge's decision whether or not to accept the proposed instruction. *United States v. Howell,* 37 F.3d 1197, 1203 (7th Cir.1994); *Church,* 970 F.2d at 408.

Ameneiro's proposed instruction would have informed the jury that they were to consider the opportunity the witness had to hear the voice *at the time of the offense.* This is not an accurate statement of the law governing voice identification testimony. Voice identification is based upon the opportunity the witness had to hear the defendant's voice *"at any time* under circumstances connecting [the speaker's voice] with the alleged speaker." *Vega,* 860 F.2d at 788 (quoting Federal Rules of Evidence 901(b)(5)) (emphasis added). Thus, because Ameneiro's proposed instruction would have erroneously instructed the jury that they were confined to considering whether the witness had the opportunity to hear the voice *at the time of the offense,* it failed to correctly state the law as it applies to testimony concerning voice identification, and he was not entitled to have that instruction read to the jury.

*X. Whether the mandatory minimum sentence Rabon received is unconstitutional*

■ At Rabon's sentencing, the district court found that, under the guidelines, Rabon would be facing a range of 188 to 235 months incarceration. However, because Rabon had a prior felony narcotics conviction, the terms of 21 U.S.C. § 841(b)(1)(A) dictated a mandatory minimum of 240 months imprisonment, and the district court judge sentenced Rabon to that period of confinement. On appeal, Rabon argues that the mandatory 240 month sentence provided in § 841(b)(1)(A) constitutes cruel and unusual punishment under the Eighth Amendment and violates the due process clause of the Fifth Amendment, since it does not permit the district judge to "evaluat[e] matters traditionally and constitutionally geared to decrease terms of imprisonment."

Rabon's first contention is that the mandatory minimum sentence he received is unconstitutional because it prevents the sentencing judge from taking into account mitigating factors. The argument that a mandatory minimum sentence which prevents the sentencing judge from taking into account mitigating factors has been thoroughly considered by many appellate courts and was rejected by the Supreme Court in *Harmelin v. Michigan,* 501 U.S. 957, 994–95, 111 S.Ct. 2680, 2701–02, 115 L.Ed.2d 836 (1991), and we will not dwell further on it here.

Rabon's second argument, that a mandatory minimum sentence serves no rational deterrent purpose, and therefore violates due process, has likewise been rejected by the Supreme Court. *See Chapman v. United States,* 500 U.S. 453, 464–68, 111 S.Ct. 1919, 1927–29, 114 L.Ed.2d 524 (1991); *United States v. Velasco,* 953 F.2d 1467, 1476 (7th Cir.1992). Thus, Rabon's arguments are without merit.

*XI. Whether the district court's refusal to permit Rosa to collaterally challenge a prior conviction used to enhance his sentence was proper*

■ Rosa was convicted of possession with intent to distribute cocaine, attempted possession with intent to distribute cocaine, and conspiracy to possess with intent to distribute cocaine. Based on the fact that Rosa had two prior state felony drug offense convictions, his sentence was enhanced from the roughly fourteen-year sentence he would have received, to a term of mandatory life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A).[21] Rosa sought to collaterally attack one of those state court convictions, specifically a guilty plea entered in 1985 to a state charge relating to cocaine possession, on the ground that he had received inadequate representation of counsel when entering his guilty plea. The government argued in response that, since the conviction Rosa sought to challenge dated from 1985, and was

---

**21.** 21 U.S.C. § 841(b)(1)(A) provides, in pertinent part: If any person commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release. . . .

therefore more than five years old, he was precluded from challenging the validity of the prior conviction under the terms of 21 U.S.C. § 851(e), which provides a five-year statute of limitations for collateral attacks of prior convictions.[22] The trial court agreed with the government's reasoning and argument, and also rejected Rosa's claim that the five-year statute of limitations was unconstitutional. On appeal, Rosa reiterates his argument that the five-year statute of limitations is unconstitutional. He argues that the application of a five-year statute of limitations prevents him from collaterally challenging the validity of his prior state court conviction and therefore violates his right to due process.

Rosa is faced, however, with the task of distinguishing the Supreme Court's decision in *Custis v. United States*, 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994), which holds (admittedly with respect to a different statute) that there is no due process right to challenge the validity of a conviction used to support sentencing enhancements based on an allegation that the defendant received ineffective assistance of counsel when previously convicted, though such a right does exist in those circumstances where the defendant did not receive any counsel whatsoever. 511 U.S. at 496, 114 S.Ct. at 1738.[23] Further, in *United States v. Arango–Montoya*, 61 F.3d 1331 (7th Cir.1995), we recently applied Custis and held (in addressing the same argument presented by Rosa) that the statute of limitations in § 851(e) is not constitutionally infirm in precluding collateral challenges to convictions used for sentence enhancement purposes. In *Arango–Montoya*, we stated that "notwithstanding any right to a collateral attack of a prior sentence guaranteed by Federal statute or the United States Sentencing Guidelines, a prior conviction may be collaterally attacked at sentencing only where the defendant claims that he was

[wholly] deprived of counsel...." 61 F.3d at 1336.

Rosa has attempted to distinguish *Arango–Montoya* on the basis that the *degree* of enhancement in his case (14 years to life) is greater than the enhancement in that case (from 63–78 months to 120 months), but he has not persuaded us that the degree of enhancement makes a difference. Rosa bases his argument seeking to distinguish *Arango–Montoya* principally on *United States v. Trujillo*, 959 F.2d 1377 (7th Cir.1992). He argues that *Trujillo* recognized the possibility that, where the quantity of drugs attributed to the defendant at sentencing causes such an increase in the defendant's sentence that the quantity becomes the "tail which wags the dog of the substantive offense," 959 F.2d at 1381 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2416, 91 L.Ed.2d 67 (1986)), a higher standard of proof could be required to attribute those drugs to the defendant for sentencing purposes. *Trujillo*, however, was a pre-*Custis* case, which dealt with quantities of narcotics attributed for sentencing purposes, not collateral challenges to prior convictions. Rosa points to nothing in *Custis* which suggests an exception to its bar on collateral challenges of prior convictions where the prior conviction leads to a significant increase, and we decline to read an exception in where the Supreme Court did not provide for such exception. Thus, as we have already rejected in *Arango–Montoya* the argument made by Rosa that the statute of limitations in § 851(e) is unconstitutional, and because Rosa has failed to offer a persuasive reason why we should treat the question differently simply on account of the degree of enhancement he received in this case, we reject his attempt to distinguish the *Custis* and *Arango–Montoya* cases. Therefore, we conclude that his due process rights were not violated

---

22. The text of § 851(e) provides: No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.

23. In a similar vein, this court held in *Cuppett v. Duckworth*, 8 F.3d 1132 (7th Cir.1993) (en banc),

that it did not constitute ineffective assistance of counsel for trial counsel to opt not to challenge the validity of a conviction used to enhance his client's sentence when the record showed that his client had executed a valid waiver of counsel and pled guilty to the charge giving rise to that prior sentence.

by the imposition of the five-year statute of limitations in § 851(e).

## III. Conclusion

In review of the record, we attempted to give the numerous arguments made by the appellants the thorough treatment they deserve. While some of their arguments ultimately proved to be untimely and without merit, we do not believe they were entirely frivolous, but they do call to mind our observation in *Zambrana*:

> [W]e note that all too often, as we are seeing in this case, the defense counsel takes a buckshot approach, hoping a pellet will strike. But the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. VanArsdall*, 475 U.S. 673, 680–81, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). Our review of the record makes it eminently clear that each of the defendants received the fair trial to which he is entitled under the Constitution.

841 F.2d at 1347. We AFFIRM.