In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2444

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SALVADOR GUERRERO-MARTINEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 480--James F. Holderman, Judge.

Argued November 30, 2000--Decided February 15, 2001

Before FLAUM, Chief Judge, EASTERBROOK and ROVNER,
Circuit Judges.

ROVNER, Circuit Judge.  Salvador Guerrero-Martinez pled guilty to one count of possession with intent to distribute in excess of 100 kilograms of marijuana in violation of 21 U.S.C. sec. 841(a)(1) and 18 U.S.C. sec. 2. On appeal, he maintains that the district court clearly erred when it sentenced him based on a greater quantity of marijuana than he actually purchased without also finding that this larger amount was part of jointly undertaken criminal activity. Because we find that the district court properly sentenced him for aiding and abetting the delivery of a larger shipment, we affirm.

I.

In June 1999, federal drug enforcement authorities in Nebraska notified their counterparts in Chicago that they were en route to Chicago with a person who was cooperating in a controlled delivery of a large quantity of marijuana. The cooperating individual, who eventually rescinded his cooperation, was Pedro Guerrero. According to the Nebraska agents who interviewed him, Guerrero had made previous trips to Chicago carrying marijuana. On this occasion, he was to meet Guerrero-Martinez on his arrival, and Guerrero-Martinez was to pay him $20,000 or $25,000 in cash for the shipment. Based on

previous deliveries, Guerrero expected to communicate with Guerrero-Martinez via telephone while he was en route, and planned to meet him at a warehouse where the exchange would take place. In preparation for the controlled delivery, the agents inventoried the contents of Guerrero's truck, counting fifteen boxes of marijuana, with each box containing approximately one hundred pounds of the drug.

The agents set up surveillance at the warehouse site where the delivery was to occur. As Guerrero was en route to Chicago, the agents recorded a number of phone calls between Guerrero and Guerrero-Martinez, including one in which Guerrero-Martinez directed Guerrero to deliver the marijuana to the warehouse the following day, July 1, 1999. Guerrero-Martinez instructed Guerrero to deliver the load during normal business hours so as not to draw attention to the delivery. At the appointed time, the agents observed Guerrero's marijuana-laden truck pull up to the warehouse to meet Guerrero-Martinez. Also in the parking lot was a white van, and Guerrero-Martinez watched as eleven of the fifteen boxes were loaded into the van by Guererro and by the van's driver, Victor Davis. Guerrero-Martinez moved his car in closer to the truck so that he could load two of the boxes into the car he was driving. As he walked to his car to deposit his two boxes, the agents on the scene arrested him.

The government later learned that, prior to this delivery, Guerrero-Martinez had met with Alcario Sanchez and a man identified as "Mario" at a restaurant to discuss preparations for the delivery. At this meeting, Guerrero-Martinez agreed to meet the truck at a warehouse, and agreed to deliver a carload of marijuana to Sanchez, who was going to sell the drugs to another individual. On the day of the delivery, Guerrero-Martinez drove Sanchez's car to the warehouse parking lot and helped unload the marijuana from the truck.

The government also learned that this was at least the second such transaction that Guerrero-Martinez had engaged in with the same suppliers. A few months earlier, Guerrero-Martinez had met Sanchez and Mario at a different restaurant to discuss another delivery. At that meeting, the men discussed where the load would be delivered, who was delivering the marijuana and who would be receiving the load. They also discussed a potential buyer for a portion of the load, and Guerrero-Martinez agreed to purchase two hundred pounds of the marijuana. He also agreed to meet the truck at a warehouse to pick up his share. As he did with the second load, Guerrero-Martinez agreed to use Sanchez's car to pick up his share.

He coordinated the delivery via telephone, and picked up his two boxes. He saw that the truck contained other boxes, but the government was unable to determine with certainty how much marijuana was in the first load or to what extent Guerrero-Martinez participated in the first delivery. After picking up the two boxes from the first delivery, Guerrero-Martinez met Sanchez with the car and returned the keys. Sanchez took the two hundred pounds to sell as they had discussed at the restaurant, and Guerrero-Martinez told him to return the money to Mario who would then pay Guerrero-Martinez. Guerrero-Martinez did not pay for the drugs prior to the delivery to Sanchez. Rather, the drugs were provided to him on credit. Two weeks later, as they had previously agreed, Sanchez and Mario paid Guerrero-Martinez $5500, his share of the profits for the two hundred pound load he purchased on credit. The second delivery was to work the same way, but law enforcement intervened and Guerrero-Martinez was arrested.

Guerrero-Martinez pled guilty to one count of possession with intent to deliver in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. sec. 841(a)(1), and aiding and abetting possession of that same 100 kilograms, in violation of 18 U.S.C. sec. 2. The government sought to hold Guerrero-Martinez responsible for the entire quantity of marijuana in both the first and second shipments. Guerrero-Martinez objected, insisting that he could only be held liable for the 400 pounds he actually purchased unless the government proved that more than that amount was within the scope of his jointly undertaken criminal activity. The district court held a hearing to determine the appropriate quantity of drugs under Sentencing Guideline 1B1.3, commonly known as the relevant conduct provision. After hearing testimony from Guerrero-Martinez himself as well as government agents who participated in the controlled delivery, the district court found that, for the first delivery, Guerrero-Martinez was liable only for the amount he purchased, approximately two hundred pounds, because the government did not have evidence regarding the circumstances of the delivery or the total quantity contained in the truck. For the second delivery, the court found that Guerrero-Martinez should be held liable for the entire amount of the shipment, approximately 1533 pounds of marijuana:

With regard to the second load, the second delivery, we do have information regarding the circumstances of that delivery, and Mr. Guerrero-Martinez, in addition to knowing that he was receiving supplies from a supplier that was supplying others, did not operate independently

of other purchasers, but, in fact, went to the location of the delivery, participated in the delivery to the extent that he remained and observed the delivery to others, and so it was foreseeable to him, and he was aware then of the conspiracy greater than his own, rather than the circumstances in Footnote 6 in which there is some--at least some knowledge on the part of each purchaser--or each seller of the street level sales of drugs that there are others, drug dealers in the same location, who sell the same type of drugs.

Here Mr. Guerrero-Martinez actively joined the delivery process of others by standing by and by going to the location at the prescribed time and becoming aware of the fact that there was additional marijuana being delivered to others beyond what otherwise would be considered operating independently.

And so accepting Mr. Guerrero-Martinez's testimony, and relying upon it as my sole basis for determining the drug quantity that was foreseeable, I believe the entire shipment of the second delivery was foreseeable to Mr. Guerrero-Martinez.

Tr. at 144-45. The court determined that, based on the total quantity of 1736 pounds (203 pounds from the first delivery and 1533 from the second), Guerrero-Martinez's base offense level would be 30. After adjustments, his offense level was 25, and the sentencing range was 57 to 71 months of incarceration. The court sentenced Guerrero-Martinez to 57 months of incarceration, and he appeals.

II.

On appeal, Guerrero-Martinez contends that the government did not meet its burden of establishing the quantity of drugs attributable to him by a preponderance of the evidence. He admits that he agreed to purchase 200 pounds of marijuana on two separate occasions. He also concedes that he knew the trucks contained marijuana for other buyers. However, he maintains that he did not know how much marijuana the trucks held, did not know who the other buyers were, and did not know the price anyone else was paying. He argues that Section 1B1.3 requires more before he may be held liable beyond the 400 pounds he agreed to purchase. Section 1B1.3 requires the court to find that the additional amounts were reasonably foreseeable to the defendant, and that he took acts in furtherance of jointly undertaken criminal activity, according to Guerrero-Martinez. He claims he was merely a retail dealer of the 400 pounds he

purchased from a wholesaler, and that the government presented no evidence on the scope of any jointly undertaken criminal activity.

We review the district court's sentencing determinations with great deference, reversing only for clear error. United States v. Berthiaume, 233 F.3d 1000, 1002 (7th Cir. 2000). This standard applies to the calculation of drug quantities. Id. A reviewing court may reverse a district court's sentencing conclusion only if after reviewing the record, it is left with the firm and definite conviction that a mistake has been made. Id. The district court calculated the amount of drugs attributable to Guerrero-Martinez under Section 1B1.3 of the Sentencing Guidelines, the provision that determines the Guideline range for relevant conduct. That section provides, in relevant part, that the base offense level and certain adjustments shall be determined on the basis of the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. sec. 1B1.3. Guerrero-Martinez claims that neither part (A) nor part (B) apply to him because he agreed only to purchase particular amounts, and did nothing to aid the sales to anyone else. Moreover, he claims that he had no idea how much marijuana was on the truck in the second shipment, and could not reasonably foresee that it contained 1500 pounds of marijuana.

As we noted, the district court found that the full amount of the second shipment was foreseeable to Guerrero-Martinez, and also that he aided in the delivery of that shipment. Under the aiding and abetting theory, the district court may hold a defendant liable if he aided his principal to commit a crime, and also wanted the principal to succeed in committing it. United States v. Ortega, 44 F.3d 505, 507 (7th Cir. 1995). Here, Guerrero-Martinez met with Mario and Sanchez ahead of time, and was aware that the marijuana he agreed to buy was just a part of the

total shipment. Guerrero-Martinez also spoke with the driver of the truck to arrange the delivery, met the truck at the prearranged destination and watched over the unloading of not only his own boxes but boxes being placed into a van belonging to another buyer. The court found that Guerrero-Martinez participated in the delivery of marijuana not just to himself but to others who were present as he oversaw the unloading of the truck. This is sufficient for aiding and abetting. See United States v. Magana, 118 F.3d 1173, 1206 (7th Cir. 1997), cert. denied, 522 U.S. 1139 (1998) (finding aiding and abetting liability when defendant allowed his car, which had a secret compartment, to be used to transport cocaine); Ortega, 44 F.3d at 507 (defendant aided and abetted sale of heroin by pointing out location of bag of heroin in van, and by watching over van).

That Guerrero-Martinez was integral to the entire delivery, and not just the delivery of the amount he purchased, was brought out in his direct testimony regarding the first delivery. Guerrero-Martinez testified that he was buying 200 pounds of marijuana on credit, and that he merely picked up the marijuana from the agreed delivery site, and immediately drove it to Sanchez and Mario, who had already arranged for another buyer. Tr. at 62-63. Sanchez and Mario then paid him $5500 in profits from the resale of the amount he bought on credit. Tr. at 61. The second deal was to work the same way, where the marijuana would be fronted to Guerrero-Martinez, whose only responsibility was to meet the truck, take delivery and transport the drugs to Sanchez and Mario. Guerrero-Martinez wondered aloud at the sentencing hearing:

I don't know what was going on with them, but they were just using me, because now--now that all this has happened to me, what was the reason that these two people were using me? They were only going to sell me two boxes, and they were going to sell them, themselves, . . . giving me the profits. They were just using me, you know, because of all of this that has happened to me. I think that's what they wanted to do with me.

Tr. at 62-63. Indeed, they were using him. In hindsight, the deal sounded too good to be true even to him. Without putting up a single dollar of his own money, he was allowed to purchase $100,000 worth of marijuana, and was given the profits from the resale without so much as locating a second buyer. All that was expected of him was to arrange to meet the truck, oversee delivery for himself and others, and drive away with 200 pounds of marijuana in the trunk of his car. Sanchez and Mario and others in the scheme

used Guerrero-Martinez to physically distance themselves from the delivery of 1500 pounds of marijuana. They needed someone to arrange and oversee the delivery, and Guerrero-Martinez was that someone. He thus aided others in the delivery of not just the 200 pounds he purchased himself, but the entire truckload.

   Because we find that Guerrero-Martinez is liable under the aiding and abetting provision of Section 1B1.3, we need not consider whether he could also be held liable under the provision for jointly undertaken criminal activity. Thus, we need not consider whether the amount of marijuana contained in the second truckload was reasonably foreseeable to him. The Application Notes for Section 1B1.3 clarify that the requirement of reasonable foreseeability applies only to subsection (a)(1)(B), the jointly undertaken criminal activity provision. "It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or wilfully causes; such conduct is addressed under subsection (a)(1)(A)." U.S.S.G. sec. 1B1.3, Application Note 2. We therefore affirm the judgment of the district court.

AFFIRMED.